12991

STATE v. KING

(155 S. E., 409)

July, 1929.

270

*Messrs. Thomas F. McDow, Clyde R. Hoey, B. T. Falls, James H. Glenn* and *Hemphill & Hemphill,* for appellant,

*Mr. Harry Hines, Solicitor, Messrs. Marion & Finley, Gaston, Hamilton & Gaston* and *A. H. Macaulay,* for the State,

278

October 8, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The appellant, Rafe F. King, was indicted by the grand jury of York County for the murder of his wife, Mrs. Faye Wilson King, on January 25, 1929.

At the instance of the appellant, Hon. J. Henry Johnson, Circuit Judge, presiding in the Court of General Sessions of York County, granted a change of venue, because, in his opinion, a fair and impartial trial might not be had in

that County, and directed that the trial of the cause be heard in Chester County.

The case was tried at the summer, 1929, term of the Court of General Sessions of Chester County, before Hon. J. K. Henry, presiding Judge, and resulted in a verdict of guilty, and the sentence of the Court that the appellant be put to death by electrocution. The appellant's motion for a new trial was denied, and the case has been brought to this Court.

The delay in the hearing of the case in this Court was due to the fact that it required a long time to get the record for the appeal in proper shape. It took about a week to try the case on circuit, and it required much time for the Court stenographer to make a transcript of the evidence. The transcript of record contains 946 pages. There are 81 exceptions.

The first and second exceptions will be considered together. The first relates to the refusal to quash the indictment. The instrument, omitting formal matters, and referring only to what is necessary to determine the attack made upon it, contained these allegations: "* * * And that the said Rafe F. King, her the said Faye Wilson King then and there feloniously, willfully and of his own malice aforethonght with his hands and arms, and with cords, wires, ropes and belts placed upon, about and around the neck and throat of her, said Faye Wilson King, did choke, suffocate and strangle, of which choking, suffocation and strangling she, the said Faye Wilson King, did then and there die. * * *"

The appellant charges that the indictment "was multifarious and stated in conjunctive form that the deceased came to her death in six or eight different ways," that the indictment was not definite; that it forced him to go to trial without knowing which one of the various instruments, means, or manners of death he was charged with having used; that the State should have been required to elect at

least one way in which it was charged that the deceased had come to her death; and, for these reasons, the indictment should have been quashed, as moved for.

Almost at the beginning of his charge to the jury, the presiding Judge used this language: "That makes the issue that you have to settle—that makes the issue for you to settle. Did he or did he not with hand, cord, and other means named in this—either one of them—kill his wife on that occasion?"

The appellant says, in his second exception, that the instruction given permitted the jury "to pick out and elect" *the instrumentality* that caused the death of the deceased, and, since the indictment was "in conjunctive form," this election on the part of the jury should not have been permitted.

We think the indictment was unobjectionable, even under the rules as to allegations in an indictment for murder before the passage of the Act of the Legislature simplifying indictments in such cases. *State v. Jenkins,* 14 Rich. (48 S. C. L.), 215, 94 Am. Dec., 132. There can be no doubt that the indictment complied with the provisions of Section 93 of the Code of Criminal Procedure 1922, originally enacted in 1887, which are as follows: "Every indictment for murder shall be deemed and adjudged sufficient and good in law which, in addition to setting forth the time and place, together with a plain statement, divested of all useless phraseology, of the manner in which the death of the deceased was caused, charges that the defendant did feloniously, willfully, and of his malice aforethought kill and murder the deceased."

Neither do we think the indictment violated the provision of Section 18, Art. 1, of our Constitution, that "in all criminal prosecutions the accused shall enjoy the right * * * to be fully informed of the nature and cause of the accusation. * * *" See *State v. Chiles,* 44 S. C., 338, 22 S. E., 339; *State v. Lark,* 64 S. C., 350., 42 S. E.,

175; *State v. Roof,* 106 S. C., 281, 91 S. E., 314. These exceptions are overruled.

During the impaneling of the jury, the name of Mr. ██ Craig, one of the venire, was drawn from the box, and the trial Judge announced that this juror had been excused upon the payment to the Court of the sum of $25. The appellant's demand that the juror be presented was refused and he complains of error in that regard in his third exception.

Section 584 of the Code of Civil Procedure 1922 gives the Court the right to fine, in an amount not exceeding $20, "a person duly drawn and summoned to attend as a juror," who "neglects to attend, without sufficient excuse. * * *" We do not construe the provisions of that section to mean that a juror, properly drawn and summoned to attend a session of the Court, should be permitted to escape the duty required of him upon the payment of $20, or any other sum of money. The imposition of the fine is authorized for the purpose of aiding and securing the attendance of jurors. If citizens, who ought to render jury service, may be relieved therefrom by the payment of money, the tendency would be to encourage a disregard of one of the unpleasant duties of citizenship. One possessing the necessary money, with the desire not to perform a burden imposed upon him by the State, could always evade jury service. For these reasons, we cannot say that we approve of the conduct of the trial Judge in this instance. There might be, too, in some cases, where a number of jurors were excused from service upon payment of money, prejudicial error. We cannot hold, however, that there was error in the instance referred to here. The required number of jurors in this case was obtained without the necessity of the appellant exhausting the number of challenges allowed him under the law. He obtained twelve jurors satisfactory to himself without the presence of Juror Craig, *State v. Burton,* 111 S. C., 526, 98 S. E., 856; *State v. Hyde,* 90 S. C., 296, 73 S. E., 180.

By the fourth, fifth and sixth exceptions, the appellant charges error in the ruling of the presiding Judge that his counsel could not examine jurors on their *voir dire,* and especially urges that he should not have been denied the right to inquire of the jurors if they had been approached by certain persons with the view of influencing them against the cause of the appellant. The rule in this State, as declared in many decisions, is that the examination of jurors, as to their fitness and competency to serve in a cause, is largely within the discretion of the Circuit Judge, and the better practice is for the Judge himself to make the examination. The Judge, of course, may permit counsel to interrogate the jurors. If there is proper showing that jurors have been approached for or against a party to a cause, we think the Judge should ask the jurors thereabout, or permit counsel to do so. But prospective jurors should not be harrassed and annoyed with all kinds of questions. The usual examination is generally sufficient to test the jurors' fitness and competency. We find nothing in the record here to show that the jurors who sat in this case were prejudiced against the appellant. All that appears is the suggestion on the part of counsel that one Johnson may have taken it upon himself to discuss the case with some of the jurors. There was absolutely nothing presented to the Court, however, tending to establish the truth of the suggestion. Under all the circumstances, we are unable to hold that there was any prejudicial error. See *State v. Sharpe,* 138 S. C., 58, 135 S. E., 635; *State v. Carson,* 131 S. C., 42, 126 S. E., 757; *State v. Nance,* 25 S. C., 168; *State v. Coleman,* 8 S. C., 239.

The seventh exception complains because the presiding Judge refused to permit counsel for the appellant, on the cross examination of S. T. Ferguson and Mrs. S. T. Ferguson, to bring out an alleged declaration made by the deceased in the home of the Fergusons a short time before her death, in the absence of the appellant,

as to the whereabouts of the appellant and his physical condition at that time. We find nothing in the record to indicate that the testimony, if it had been allowed, would have been competent. It clearly did not come within rule of *res gestæ;* nor was it in the nature of a threat. It, obviously, was not permissible under any exception to the general rule that "hearsay evidence" is not to be allowed. See *State v. Bigham,* 133 S. C., 491, 131 S. E., 603.

Mrs. J. H. Saye, a witness for the prosecution, who saw the body of the deceased, testified: "There was a red streak around her neck." She was asked by the attorney, examining her for the State, to describe that streak. In reply, she said, "It looked as if it had been made by rope or cord, or even by finger print." Upon objection to this last statement of the witness by counsel for the appellant, the Court ruled the testimony competent. Mrs. Saye was not a physician or expert as to wounds and injuries. The State was seeking to show that the deceased had come to her death by reason of strangulation. The statement of the witness was clearly incompetent under the circumstances, it being merely an expression of her opinion as to the means by which the streak around the neck of the deceased had been made.

"In order that a witness may be allowed to state an inference from observation as to medical or surgical matters he must be a skilled observer, and mere opportunity for observation, without the technical training necessary to co-ordinate the observations into a conclusion valuable to the jury, is not sufficient." 17 Cyc., 204.

The eighth exception must be sustained.

The tenth, eleventh, twelfth, and fourteenth exceptions relate to the cross examination by one of the attorneys for the prosecution of C. C. Blanton. The thirteenth exception charges error in the Court permitting a prejudicial cross examination of appellant's witnesses, McMurray, Webb, Delliger, and Logan, but this exception is entirely too general.

The twenty-ninth exception refers to improper cross examination of appellant's witness, Webb, and the thirtieth to such improper examination of his witness, Estridge. All the witnesses mentioned testified as to the good reputation of the appellant for peace, good order, honesty, and integrity.

The appellant charges that the cross examination was unfair; that in it the counsel misquoted testimony of other witnesses; that the evident purpose was to demean the standing, not only of the appellant, but of the witnesses; and that many of the questions asked, and remarks made by the counsel, were personally abusive of the witnesses.

The purpose of cross examination is to assist in bringing out the truth. It must be left very much to the discretion of the trial Judge. Counsel, engaged in the prosecution of a man charged with crime in this State, should be fair to the defendant and to his witnesses. There are proper limits to cross examination. A defendant in our Criminal Courts has the right to offer witnesses in his behalf, and, in the exercise of this constitutional right, his witnesses should be protected from personal abuse and improper insinuations against their character. A cross examination of a witness should not go into matters absolutely extraneous to the issues of the trial. While we are unable to hold that the cross examination of these witnesses, and the rulings of the trial Judge thereabout, standing alone, were of such nature as to call for a reversal of the judgment against the appellant, we are inclined at this time to say that the cross examination went far afield. Many of the questions asked of the witnesses were entirely argumentative. Some of the questions asked, and disallowed by the trial Judge, gave considerable evidence that the cross examination was unfair. The trial Judge properly tried to protect the appellant and his witnesses from this improper cross examination. Showing that he did attempt to rule out questions entirely improper, we call attention to this particular matter in the cross examination of the witness, Webb. The attorney, cross ex-

amining this witness, asked, "You know that Prof. Snooks of Columbus, Ohio, who admitted killing a woman"—and on objection to the question, the Court said positively, "Don't go into that." The case of Professor Snooks had nothing to do with the trial of this appellant. The attorney examining the witness should not have attempted to prejudice the appellant's case in this manner. It is not out of place to warn members of the bar, who may be called upon to take part in the trial of causes, against improper cross examination. We especially desire to sound a warning to lawyers who are called upon to assist our solicitors in criminal prosecutions. There is, undoubtedly, a tendency on the part of these attorneys, in their zeal in their capacity as privately-paid attorneys, to go too far in conducting cases, especially in the cross examination of a defendant and his witnesses. In the recent case of *State v. Kennedy,* 143 S. C., 318, 141 S. E., 559, we held: " * * * Uncalled for personal abuse of a witness by counsel is objectionable, and will not be condoned or allowed by the Court." If the record in any case shows that this salutary rule has been violated, and the effect was, in this Court's opinion, to prevent one charged with crime from having the fair and impartial trial guaranteed to him under the Constitution of this State, this Court will exercise its power to uphold the Constitution by reversing the case, with the purpose of giving a defendant the trial to which he is entitled.

In this connection, we consider Exception 27. On the cross examination of the appellant's sister, Mrs. Ione Moss, counsel for the State asked: "At that time and place that I have referred to there that night at the home of Rafe King, about 11 o'clock, did you say to Mr. Reagan, Rafe King's brother-in-law, 'Do you think Rafe did it?'" Before this question was asked, the witness had been asked practically the same question several times. She said that she did not recall asking the question inquired about. No objection to the question was at first made. Later, when the

question we have quoted was asked, there was objection. The Court then ruled that the question was improper, on the ground that there was no showing that the appellant was present when his sister, the witness, asked the question of Mr. Reagan. Because the witness had already answered the question, and for the reason that the Judge finally, on objection, ruled it incompetent, we do not see how the appellant can now complain of error. It is not improper for us to say, however, that the question was incompetent and prejudicial. The appellant was not present at the time. He could not be bound by any statement or question of his sister to other persons.

The appellant's witness, Dr. H. M. Ross, did not examine or see the body of the deceased. It appears that he heard in the trial the testimony of all of the witnesses, both for the State and the defense, as to the physical condition of the deceased, and the description given by the witnesses of the injuries found upon her. Appellant sought to have Dr. Ross express an opinion from the facts testified to by the doctors and chemists as to whether it was more probable that Mrs. King came to her death by poison than by strangulation. The manner in which the injury, which caused the death of the deceased, was inflicted was not only one of the main issues in the case, but it was, in all probability, the most important one to be determined. The State endeavored to show that the deceased came to her death from strangulation. The cross examination of the witnesses for the State as to the cause of death, and some evidence offered in behalf of the appellant, tended to show that the deceased died of poisoning. When an expert witness does not of his own knowledge know the facts upon which his opinion is based, he cannot testify as to an opinion, except in answer to a hypothetical state of facts. *Easler v. Southern Railway Co.,* 59 S. C., 311, 37 S. E., 938. The proper hypothetical question, based upon supposed facts, was not asked of Dr. Ross. The question asked of the witness sought

to obtain his opinion upon the evidence in the case. That was one of the questions the jury had to decide; it was not for the witness to decide. The sixteenth exception is without merit.

The seventeenth, eighteenth, nineteenth, twentieth, twenty-sixth, and thirty-first exceptions charge various and sundry errors on the part of the trial Judge in assisting witnesses for the State in giving their testimony, in refusing to hear the appellants's counsel fully as to their grounds of objection to testimony brought out by the prosecution, and the grounds urged by them for the admission of testimony from the appellant's witnesses. We have examined the matters out of which all these exceptions arise carefully and are unable to find any prejudicial error. There were many attorneys engaged in the trial of the cause. If the presiding Judge had stopped to hear an extended argument from each one of them as to the admissibility and inadmissibility of testimony, the trial of the case would have been unduly protracted. It was only required of him to allow the attorneys to make their objections in the proper manner and have them entered of record. He was not required to listen to any arguments as to the relevancy of evidence.

We do not think either that the trial Judge did anything improper in "assisting the State's witnesses," as complained of by the appellant. We think his only purpose was to aid in bringing out the truth, not to assist either the State or the appellant. As long as he did this, and did not, in doing so, indicate in any way his opinion as to the guilt or innocence of the appellant, there was nothing objectionable in his conduct. As repeatedly said by this Court a trial Judge should carefully avoid asking questions, or making remarks, which would cause the jury to ascertain his opinion of the force and effect of any evidence offered in the case. On the other hand, it is, not only the right, but the duty of the Judge, when witnesses are being examined, to aid the

witnesses in a proper understanding of the questions put to them, so that the witnesses may answer intelligently. The exceptions under consideration are held to be without merit.

While J. Frank Faulkner, a witness for the State, was being cross examined, he was asked several questions as to Horace or H. L. Johnson. Evidently, this was the same person referred to in the examination of some of the jurors. Mr. Faulkner testified that Johnson formerly held a position of constable in York County. He was then asked, "What became of him; why is he not in the constabulary force now?" On objection, the Court held the question incompetent. He indicated, however, that, if it appeared later that it was competent, he would allow the witness to be put back and have him answer the question. Johnson was not a witness in the case. Nothing was brought out to show that it was necessary or proper to make inquiries as to why he was not at the time a constable. The twenty-first exception raising this question is overruled.

Dr. B. F. Robinson of the Department of Chemistry of Clemson College was in attendance upon the Court as a witness for the prosecution. During the examination of Dr. J. H. Saye, also a witness for the prosecution, one of the counsel for the State announced that he would like to withdraw Dr. Saye from the witness stand, so that Dr. Robinson could testify, that he might leave as early as possible to return to his duties at his college. State's counsel said that Dr. Saye would be put up later, and that defendant would be given full opportunity to cross examine him. There was a colloquy between the attorneys, in which the Court took some part, and the Judge said : "I am going to make this ruling at this time; you examine Dr. Saye. I am going to get the professor from Clemson College off tonight if it takes until twelve o'clock."

The quoted remarks of the presiding Judge are urged as error in the ninth exception, the ground being that the language used by the Court unduly impressed the jury with the

importance of the personality and testimony of the State's witness, Dr. Robinson.

It is sometimes a dangerous thing to take a witness, especially one for the State, from the stand until his cross examination by the defendant has been concluded. It should rarely be done at any time, except upon the express consent of the defendant. The defendant's right of examination may be interfered with for some reason which at the time cannot be foreseen.

The exception under consideration, however, is directed, not to the withdrawal of Dr. Saye from the witness stand, but to the remarks used by the presiding Judge. We are unable to find any error in the remarks. It was all right for the Court to seek to accommodate the conveniences of witnesses, especially witnesses engaged in public services. When it seemed rather difficult for the Judge to get the attorneys to consent in his efforts to accommodate the convenience of Dr. Robinson, the trial Judge naturally became a little impatient, and, without doubt, in order to bring about an agreement in the matter, and to expedite the business of the Court, he announced in his rather vigorous way, his purpose to endeavor to aid Dr. Robinson in giving his testimony as early as possible. We do not think the language used, however, could by the most strained construction be regarded as any expression of the trial Judge as to the force and effect of the testimony to be given by Dr. Robinson.

The fifteenth exception refers to certain remarks of the presiding Judge, as follows: "I don't think there is any use in that, that is, what Dr. Robinson says; I don't see any use of fooling with that with this witness."

As we understand the exception, the statement made by the Judge occurred during the cross examination by an attorney for the State of Dr. Ross, a witness for the appellant, and the Judge's remarks were addressed to that attorney. The appellant contends that in using the language complained of the Court expressed his opinion as to the weight of Dr.

Robinson's testimony, and refused to allow the defendant the opportunity to contradict by Dr. Ross the evidence of Dr. Robinson. We are altogether unable to agree with either of these contentions. If the language of the Judge had any effect one way or the other, it appears to us that it rather reprimanded the attorney for the State for his manner in cross examining appellant's witness, and we are unable to see how that in any way amounted to prejudice to the appellant.

The twenty-second exception charges error on the part of the presiding Judge in allowing the State to withdraw temporarily from the witness stand its witness, Sheriff F. E. Quinn, and permitting the State to offer another witness, Dr. John A. Kolmer, to be sworn and examined. Sheriff Quinn was afterwards returned to the stand and was examined fully, both in chief and on cross examination. There was no error as charged. As indicated before, however, the much safer practice is not to withdraw a witness from the stand in a criminal case until his cross examination has been completed by the defendant.

In his twenty-third exception, the appellant complains that when Dr. Kolmer was a second time called as a witness, he was allowed to repeat certain testimony given by him in his first examination, the error assigned being that thereby the testimony of Dr. Kolmer, an expert, was unduly emphasized. We find no error as alleged for the testimony of the witness was, in our opinion, explanatory of former testimony of his, taken in connection with other testimony of Dr. Todd, who had testified after Dr. Kolmer had given his first testimony.

The appellant's counsel sought to cross examine Sheriff Quinn, a witness for the State, as to his activities as to the bail proceedings in behalf of the appellant had before the Chief Justice of the State. On objection, some of the questions were ruled incompetent. What occurred in any hearing before the Chief Justice on applica-

tion for bail by the appellant, or on application by the State to increase the amount of that bail, were irrelevant issues in the case, and the ruling of the Circuit Judge, alleged to have been erroneous in Exception 24, was correct.

Upon the day of the inquisition held over the dead body of the deceased, the appellant, Mr. Glenn, the solicitor, and Sheriff Quinn, engaged in conversation as to the manner of the death of the deceased. While this conversation was taking place, according to the testimony of Sheriff Quinn, Will King, a brother of the appellant, came to the room where Solicitor Glenn and Sheriff Quinn were talking to the appellant, and Will King said to the appellant, "You come out of there, you got no business in there." So far as the record shows, the appellant made no reply to the remarks of his brother, and paid no attention to them. The appellant objected to the witness, Quinn, testifying as to the statement of Will King, but his objection was overruled. We are of the opinion that, under the circumstances, it was error for the Court to allow the statement of Will King to be related by the witness, Quinn. The appellant was not bound in any way by the remarks or advice of his brother, especially when he did not act thereon, or make any comment thereabout. The twenty-fifth exception, relating to this matter, must be sustained. See *State v. Underwood*, 127 S. C., 1, 120 S. E., 719; *State v. Bigham*, 133 S. C., 491, 131 S. E., 603.

In the twenty-eighth exception, error is alleged because of the refusal of the presiding Judge to allow appellant's witness, Mrs. Ione Moss, to testify as to a conversation between the appellant and the witness, in the home of the appellant, prior to the death of appellant's wife. It was sought to justify the admission of this testimony on the ground that Mrs. Ferguson, a witness for the State, had testified to a conversation she had with the appellant, in the presence of the appellant's wife, in the same home a short while previous to the time of the conversa-

tion appellant attempted to bring out from his witness, and the position is taken that the conversation of the appellant with Mrs. Moss was, in a way, a continuation of the conversation had with Mrs. Ferguson, according to the testimony of that witness. We are unable to agree with the contention of the appellant. The testimony of Mrs. Ferguson, as to the statement of the appellant to her, was properly held by the Court to be a declaration against interest. After Mrs. Ferguson had left, any statement of the appellant, seeking to explain what he had told Mrs. Ferguson, was properly considered a declaration in interest. If Mrs. Ferguson had been present at that time, and it was shown that the two conversations were part of the same general conversation, we think the testimony would have been permissible, but, under the circumstances, we think the ruling of the Court was correct.

The twenty-ninth exception sets up error as to the cross examination of the appellant's witness, Webb, who testified as to the appellant's good reputation. In this examination, the witness was asked questions tending to show that he might have heard that the appellant's wife had been requested to resign her position as a school teacher in the schools of Shelby, N. C., because she was afflicted with a loathsome disease, alleged to have been communicated to her by the appellant. The record does not show that there was proper objection entered to the examination of the witness about which complaint is now made. Because there was no such objection, we are compelled to hold that there was no error. In connection with what we have already said, however, as to the cross examination of the appellant's witnesses, we think it not out of place to say that it is our opinion that the questions asked of the character witness, Webb, were altogether irrelevant.

The witness, Estridge, who testified as to the appellant's good reputation, was cross examined as to trips the witness had made with the appellant to De-

troit, and in the twentieth exception it is contended that the examination was improper. No objection was entered, so far as the record shows, at the time the questions were asked. Regardless of this, however, we do not think the questions were out of place. As a matter of fact, they did not help or hurt appellant in his case. About the only effect they had was to prolong the trial of the case.

In the beginning of his charge, holding the indictment in his hand, the presiding Judge used this language to the jury: "That is the charge; now, that is the charge. The defendant says, 'I didn't do it; I plead not guilty.' That makes the issue that you have to settle— that makes the issue for you to settle. Did he or did he not with his hand, cord, and other means named in this —either one of them—kill his wife on that occasion? Did he or not? That is for you, and you alone can settle it."

A little later he made the following statement: "There are some murders that are more heinous in the sight of the law, and God and the State, and out of the consideration of so many cases of different kinds and different heinousness—heinous and not all heinous."

In the thirty-second, thirty-third, and seventy-second exceptions, the position is taken that the quoted instructions were erroneous and prejudicial to the appellant, for the reason that the Court dwelt upon the social and moral aspect of the offense with which the appellant was charged, and continually spoke of the appellant and the deceased in the social and moral relation of husband and wife instead of the legal relation of defendant and deceased, thereby impressing upon the mind of the jury that a husband charged with killing his wife was not to be tried by the same rules of law and evidence that governed in other cases of homicide. Taking the language excepted to in connection with the whole charge, we are compelled to sustain these exceptions for the reasons assigned, under the authority of the case of the *State v. Ferguson,* 91 S. C., 235, 74 S. E., 502, 504. In that

case, the defendant was charged with a homicide, growing out of the death of his father. The presiding Judge at the trial repeatedly referred to the deceased and the defendant as father and son. Mr. Justice Hydrick, speaking for this Court, held that the charge as given, because of the repeated references to the parties in their family relationship, was prejudicial to the defendant. Said Mr. Justice Hydrick in his opinion: "Such a reference to the parties, though in accordance with the facts, was, nevertheless, unfortunate. While it may not have had any weight with the jury, it may have impressed upon them the idea that a son was not entitled in law to the same right of defending himself against an unlawful attack of his father as against that of any other person. The law is no respector of persons. Whatever we may say or think as to the social and moral aspect of the case, the law gives a son the same right to defend himself against the unlawful and deadly assault of his father that it does to defend himself against the unlawful and deadly attack of any other person. In such a case the son is entitled to be tried by the legal rather than by the social and moral standard. We cannot say that the charge, in its general scope and tone, did not impress upon the jury an erroneous idea that the defendant did not have the right to defend himself against an unlawful assault made upon him by his father, just as if it had been made by any other person."

The appellant in this case, charged with the murder of his own wife, was, nevertheless, entitled to a fair and impartial trial, just as much as if he had been charged with the murder of an entire stranger. The language used by the presiding Judge was "in accordance with the facts," but, as said in the *Ferguson case,* it "was, nevertheless, unfortunate." The whole scope and tone of the charge, like that in the *Ferguson case,* was calculated to "impress upon the jury an erroneous idea" that the appellant, since he was on trial for the murder of his wife, was not entitled to the

same consideration that should be given to all defendants, generally, in homicide as well as other criminal cases.

The appellant's exceptions from 34 to 53, both inclusive, and his exceptions numbered 64, 65, and 66, relate to the charge of the presiding Judge to the jury. The exceptions from 56 to 63, both inclusive, relate to certain requests to charge, submitted by the appellant, some of which were refused by the trial Judge, and others which were not charged as requested, but were modified or changed.

It would incumber this opinion entirely too much to take up these numerous exceptions *seriatim*. We do not even think it necessary to go into a detailed statement as to the many errors concerning the charge and refusal to charge, imputed by the appellant. The charge to the jury will be reported.

A reading of the entire charge and the Judge's modification of requests to charge, and his comments as to those requests, show clearly, in our opinion, that the honored Circuit Judge departed many times from the usual instructions given in a homicide case, and doubtless, this departure caused him to commit several errors in instructing the jury, which we regard as being so prejudicial as to require a reversal of the judgment against the appellant. We deem it only necessary to call attention to some of the grave errors into which the presiding Judge fell. Instructions given in the charge not mentioned are not to be considered as being approved, for we think it much better for trial Judges, in charging juries in homicide cases, to stick closely to the legal principles which have been so often announced by this Court.

The comparison of the trial Judge of a Court of Justice to a "tug-play party" was unfortunate. The illustration was confusing and misleading. It did not properly inform the jury that the issue before them for determination was to be decided upon the rule of the law that one accused of crime is not to be found guilty of that crime

until the jury is satisfied beyond a reasonable doubt of the guilt of the accused.

The instructions to the effect that, if error was committed by the jury against the defendant, in rendering their verdict, the case could be reviewed by the Supreme Court and sent back for a new trial; but if an error was committed by the jury against the State, and in favor of the defendant, the case could not be reviewed by the Supreme Court, was calculated, undoubtedly, to advise the jury that, if they had a reasonable doubt as to the guilt or innocence of the appellant, that doubt should be resolved in favor of the State. The law is to the contrary. The defendant in a criminal case is entitled to the benefit of all reasonable doubt. The State is never entitled to the benefit of that doubt.

The language of the presiding Judge in his instructions as to the right and duty of the jury, in the event the appellant was found guilty of murder, to recommend him to the mercy of the Court, was confusing and misleading, and not in harmony with the provisions of Section 2 of Volume 2 of the Code of 1922. That section is as follows: "Whoever is guilty of murder shall suffer the punishment of death: *provided, however,* That in each case where the prisoner is found guilty of murder, the jury may find a special verdict recommending him or her to the mercy of the Court, whereupon the punishment shall be reduced to imprisonment in the Penitentiary with hard labor during the whole lifetime of the prisoner."

Before the enactment of the Act of Dec. 21, 1894 (21 Stat., p. 785), the punishment for the crime of murder was death only. The Act mentioned gave to a petit jury the right, when it found a defendant guilty of murder, to recommend him to the mercy of the Court, and this recommendation has the effect of reducing the punishment from death to that of imprisonment in the penitentiary, with hard labor, for the lifetime of the prisoner, found guilty. The statute is very

broad. It is clear that under its terms a jury may, for any reason whatever appearing to them, refuse to have the accused put to death, but may spare his life. The proper charge to be given as to this statute is for the presiding Judge to simply inform the jury that under its provisions they may recommend the defendant to the mercy of the Court, and that the effect of such recommendation will be to save the accused from death, and cause him to be sentenced for lifetime imprisonment at hard labor. The presiding Judge was in error in stating to the jury repeatedly that they had nothing to do with mercy, and he committed further error in then telling the jury some of the instances in which they should recommend mercy.

In his charge, it was erroneous for the Judge to use the following language: "An order issued to a sheriff to take this man out and hang him, the law justifies it—so, taking human life there is justified under the law."

While it is true that formerly the Court could direct a sheriff to hang one found guilty, without recommendation to mercy, of murder, the law does not now provide for hanging at all. The language used may also have had the effect of intimating to the jury the Judge's belief that the appellant should be put to death because of the crime alleged to have been committed by him.

The charge did not clearly and correctly instruct the jury, that, if they had a reasonable doubt as to whether the appellant was guilty of murder or manslaughter, it was their duty to resolve that doubt in his favor, and find him guilty of the lesser offense. It is plain that the rule of reasonable doubt requires that a defendant charged with murder, be extended the benefit of that doubt, when it is questionable that the crime committed by him was murder or manslaughter.

There was serious error in the following instruction: "Now, if a man, charged with murder, presents to you no excuse for it, no justification of it, nothing

else appearing to justify or excuse it, that is murder, because one of the definitions I gave you was, to take human life without justification or excuse, is murder." The language used probably had the effect of advising the jury that the appellant, who did not take the stand as a witness, should have offered himself as a witness, and made some excuse or justification as to the death of the deceased. This instruction also may have caused the jury to believe that it was the duty of the appellant to establish his innocence of the crime against him, although the law is that the defendant does not have to prove his innocence, but the State must prove his guilt beyond a reasonable doubt.

It was error for the presiding Judge to tell the jury that manslaughter was "not the felonious— but the unlawful taking of human life, usually in sudden heat and passion upon—now, listen, some sufficient legal provocation." The crime of manslaughter is a felony in this State. Under our Criminal Code, Sections 1 and 10 of the Code of 1922, the distinguishing element between murder and manslaughter is that of malice. Malice must be shown to convict one of murder. It does not have to be shown to convict one of manslaughter. But both murder and manslaughter are felonies.

The charge of the Circuit Judge as to circumstantial evidence, we think, was entirely misleading and not in accord with the instructions as to the character of evidence usually given in our Courts. The illustration as to the jay bird on an electric wire is an entirely new illustration in explaining circumstantial evidence. We think it was confusing.

The eighth request of the appellant was as follows: "Now, the defendant claims in this case, not only that he is not guilty of the offense, but that the death of Faye Wilson King was the result of an act of her own, that she committed suicide. Now, is there a reasonable doubt upon that point? If you find that there is a reasonable doubt as to whether or not Faye Wilson King killed herself—

took her own life—then you cannot convict the defendant in this case, because it must be shown beyond a reasonable doubt that Faye Wilson King did not commit suicide and that this defendant did kill her, before you can bring a verdict against him."

In refusing that request, the Circuit Judge commented as follows: "Now, gentlemen, I can't charge you that. The State has got nothing to do with the suicide part of it' except you have to consider it, because, from that request, I presume—I can't see—I presume that is really the way for it, because if she committed suicide, the State hasn't proven that she did it—and I don't know whether that question is even here."

The request to charge should have been given. The question of suicide was in the case. If the deceased committed suicide, the appellant was not guilty of murder or manslaughter either.

An insurance policy on the life of the deceased, wherein the appellant was named the beneficiary, was introduced in evidence, and under its terms, the beneficiary could not collect the amount thereof if the insured had committed suicide. The appellant requested the Court, in that connection, to charge the jury as follows: "I charge you as a matter of law that under the laws of South Carolina the defendant, Rafe King, could not collect the insurance upon the insurance policy which is in evidence in this case upon the life of his wife, Faye Wilson King, in which policy he is named as beneficiary, if the said Faye Wilson King committed suicide, as said policy would be void." The request was refused. The principle announced was a correct one, and we think it was applicable to the case.

It was error for the Court to instruct the jury that in our State there is a crime known as "second degree murder." We have no such grade of the crime of murder in South Carolina. This error was perhaps harmless,

however, as there was no effort on the part of the jury to find a verdict of second degree murder.

One of the requests to charge of the appellant as to circumstantial evidence—the main request along that line—began with this statement: "I charge you that the State relies in this case upon circumstantial evidence. * * *" The Court declined to charge the request because of the language quoted, and remarked: "Now, I can't tell you that, because I find other evidnce here, too; I can't tell you what the State relies upon, but there is evidence here if a body admit—and I charge you the law of circumstantial evidence."

The statement that the prosecution relied upon circumstantial evidence was a correct one. Certain alleged conduct and explanations of the deceased were testified to by witnesses for the State, but even these matters were parts and parcels of the circumstantial evidence on which the State asked the conviction of the appellant. If there had been testimony that the appellant had admitted killing the deceased, the refusal of the Judge to make the statement requested, would have been proper, but there was no such admission on the part of the appellant, testified to by any witness.

The appellant was not sworn as a witness in the trial. The Court did not charge the jury that his failure to go upon the stand and testify should not operate against him. There was no request for the instruction on the part of the appellant. There is no doubt the instruction should have been given if requested. It is our view, however, that in the absence of a request therefor, it was no error on the part of the trial Judge in his failure to give it. See *Bargeman v. State*, 17 Ga. App., 807, 88 S. E., 591.

Several exceptions complain at the manner in which the charge was delivered, the appellant contending that his requests to charge, when allowed, were given in a low and almost inaudible tone of voice, and on this account, the jury could not well hear them, and he asserted in an affidavit filed on his motion for a new trial, that he

was unable to hear the full charge of the Judge to the jury. Some of the exceptions also complain of error in refusing a new trial for the same reasons.

The record shows that the presiding Judge did have some throat trouble, which interfered with the sound of his voice. In the early part of the charge, however, upon discovering this, he left the Judge's stand and went nearer to the jury box so that the jurors could hear him better. After he had taken this position, he inquired if the jurors could then hear and understand him, and he was informed by some of the jurors that they could hear him all right. He then repeated the instructions he had formerly given from the bench. We are unable to agree with the appellant that there was error in this regard.

Appellant's fifty-fourth exception urges that there was prejudicial error in the Court refusing to charge his first request, as follows: "I direct you to write a verdict of not guilty." In this connection, we consider also the seventy-fifth, seventy-sixth, and seventy-seventh exceptions, which urge error in refusing to grant the motion for a new trial, because the verdict was contrary to the evidence and was not supported by legally competent evidence. In view of the result of the appeal, we regard it as improper for this Court to attempt to consider fully these exceptions, which would necessitate a review of all the evidence in the case, a task which would require much time, and might result in prejudicing the appellant or the prosecution hereafter. We content ourselves with the simple statement that there was no error in the rulings of the Court as to the matters mentioned in these exceptions.

Many of the exceptions relate to various statements made by some of the attorneys for the prosecution in their arguments to the jury, which the appellant claims were in the nature of criticisms on the part of these attorneys for his failure to testify as a witness in the case. It is, of course, well recognized that an attorney for the pros-

ecution should not either directly or indirectly call to the attention of the jury the failure of a defendant to testify in a criminal case. A defendant has the right under the law to testify or to refuse to testify. We find in the record before us only one instance where during the arguments, complaint was made of the remarks of an attorney in this regard. Upon objection being entered, the attorney promptly apologized for his remarks, and the Court admonished the jury not to consider them. The proper practice, when prosecuting counsel refers to the failure of the defendant to testify, is for his counsel to interpose immediate objection and have the trial Judge rule on the matter; and if the objection is sustained, for him to admonish both the attorney and the jury. Under the circumstances, we find no error.

It is contended that the appellant should have been granted a new trial, on his motion therefor, for the reason that the Court permitted a hostile audience to crowd in and around the appellant during the trial, and to show its hostility by its demeanor. When the motion for a new trial was heard by the Circuit Judge, he reviewed very fully that particular complaint of the appellant, and he was of the opinion that, while the crowd in the courtroom was large, it was well behaved and orderly in all respects. We do not think the showing made by the appellant was sufficient to require the Court to grant him a new trial on the ground stated. It is not out of place however, for this Court to point out to the Circuit Courts and attorneys, and to the public generally, that trials of persons for crime are to be conducted in an orderly manner. The courtrooms should not be overcrowded. The space within the bar reserved for Court officials, jurors, attorneys, parties, and witnesses should be kept clear from the general public, so that the defendant can see, and be seen by the jury, so that he may see the witnesses when they are testifying. This Court has gone on record along this line, by granting a new trial in an important homicide case. *State v. Weldon,* 91 S. C.,

29, 74 S. E., 43, 45, 39 L. R. A. (N. S.), 667, Ann. Cas., 1913-E, 801. In the opinion in that case, the late honored Mr. Justice Woods, speaking for this Court, had this to say: "Clearing away the hostile crowd from time to time did not meet the case. Fairness required that at least the space between the accused and their counsel, the jury and the witnesses should have been kept free from intrusion. Courts cannot control public sentiment; but their commission from the people is to keep the inviolable precincts of the prisoner's dock, the counsel's place, the witness chair, the jury's seats, and the intervening space free from either hostile or friendly invasion or intrusion, lest the accused be terrified or his counsel confused in making his defense, lest the witness testify falsely under fear of indictment, lest the jury be overawed, or their minds influenced by an atmosphere surcharged with hostility or partiality. The intrusion into these inviolable precincts of a large number of persons, part of a vast assemblage hostile to the prisoners, was calculated to terrify the defendants, to confuse their counsel, to intimidate the witnesses, and to overawe the jury."

If it appears that this Court has not directly considered any particular exception, its failure so to do is due to the fact that we have thought it not necessary, in the determination of the main questions in this appeal, to pass upon such particular exception.

Because of the errors, prejudicial to the appellant, indicated herein, it is the judgment of this Court that the judgment below be, and the same is hereby reversed, and the cause is remanded to the Court of General Sessions of Chester County for a new trial.

MESSRS. JUSTICES COTHRAN and STABLER, and MR. ACTING ASSOCIATE JUSTICE GRAYDON concur.

MR. JUSTICE CARTER concurs in result.