Sylvester Lewis **ADAMS,**
**Petitioner–Appellant,**

v.

James **AIKEN, Warden, Central**
**Correctional Institution,**
**Respondent–Appellee.**

No. 91–4000.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1992.

Decided May 19, 1992.

---

David Isaac Bruck, Columbia, S.C., argued, for petitioner-appellant.

Donald John Zelenka, Chief Deputy Atty. Gen., Columbia, S.C., argued, for respondent-appellee.

Before SPROUSE and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

BUTZNER, Senior Circuit Judge:

Sylvester Lewis Adams appeals the denial of his petition for writ of habeas corpus. We affirm the district court's judgment.

### I

Adams was arrested and charged with the kidnapping and murder of Bryan Chambers, housebreaking, and armed robbery. The armed robbery count was dismissed. A jury convicted Adams of the other crimes and sentenced him to death. The South Carolina Supreme Court reversed and remanded for a new trial because of evidentiary and procedural errors. *State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (1981).

On remand, a second jury convicted Adams and sentenced him to death. The South Carolina Supreme Court affirmed this conviction in *State v. Adams*, 279 S.C. 228, 306 S.E.2d 208, *cert. denied*, 464 U.S. 1023, 104 S.Ct. 558, 78 L.Ed.2d 730 (1983). Adams sought and was denied postconviction relief in the state circuit court. The South Carolina and United States Supreme Courts denied certiorari. *Adams v. Aiken*, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986).

Adams filed a petition for writ of habeas corpus in June, 1986, alleging numerous errors in his trial. After an evidentiary hearing on the issue of Adams's mental competency, the United States magistrate recommended denial of the petition. The district court adopted the magistrate's report and recommendation, and this appeal followed.

The Supreme Court of South Carolina summarized the evidence as follows:

On October 17, 1979, at approximately 3:00 p.m., Bryan Chambers, a sixteen year old with a slight learning disability, was taken from his home and strangled to death in a wooded area directly behind the house. Shortly thereafter, Bryan's mother received a phone call. The only words she could make out were "boy ... place ... money...."

Bryan's mother hung up on the caller not knowing at that time that her son was missing.

The evidence introduced at the trial relating to the abduction is as follows:

1) Forced entry into the house through the rear door with the use of a tire tool (or jack handle).

2) A piece of tablecloth was torn from the dining room table and used to hold a sock in the victim's mouth.

3) Venetian blind cord, removed from the house, was used to bind his feet once he had been forced into the wooded area behind the house.

4) The strangulation was caused by placing a stick in the tablecloth (pulled down around his neck) and tightening it in the fashion of a tourniquet.

5) A butcher knife was missing from the victim's home and there was a deep cut above one of his ears consistent with a blow from such a knife.

James Jeter was a key state's witness. His testimony may be abbreviated as follows: The defendant (Adams) rode a bicycle into Jeter's backyard where he was raking leaves. Adams had a tire tool, a gun and a pair of gloves in his possession. Adams told Jeter he was going to break into the house next door to steal money.

After entering the house, Adams attempted to solicit Jeter's aid in removing a safe he had allegedly found there. Jeter refused. Adams then stated he would await Bryan's return home from school to get the combination.

Jeter spoke with Bryan in Bryan's front yard when he returned home a few minutes later. He did not warn Bryan that Adams was inside because he was afraid.

A short time later, Jeter saw Adams lead Bryan into the woods with something white tied around Bryan's neck. He appeared to be resisting Adams.

A search for Bryan was conducted by Jeter's father and Bryan's father (A.C. Mitchell) in the early evening. Jeter became concerned about his friend and asked Adams where he was. Adams told him Bryan was tied up in an abandoned house and he would be released when Bryan's parents gave him (Adams) some money. He also told Jeter he had attempted a ransom call but Bryan's mother had hung up on him before he could tell her where to deliver the money.

Bryan's body was found covered with brush by rescue workers the following day. The next day (two days after the killing), Jeter told the police for the first time that he knew about the incident.

A.C. Mitchell testified that on the evening of his son's death, when he and a neighbor were searching for Bryan with the aid of Bryan's small dog (which had been found trapped inside the washing machine of the boy's home), Adams had frightened them away from the area where Bryan's body was later found by appearing with his pit bulldog allegedly to aid in the search.

*State v. Adams,* 279 S.C. at 230–31, 306 S.E.2d at 209–10.

## II

Adams first asserts that the jury instruction defining reasonable doubt violated his right to due process by unconstitutionally lowering the state's burden of proof.

The trial judge defined reasonable doubt as follows:

> Now I do not mean, ladies and gentlemen, by the term reasonable doubt that it is some whimsical or imaginary doubt. It is not a weak doubt, it is not a slight doubt. It is a substantial doubt, a doubt for which you can give a reason. It is a substantial doubt arising out of the testimony or lack of testimony in the case for which a person honestly seeking to find the truth can give a reason. If you have such a doubt in your mind as to whether or not the State has proven this defendant guilty, you should resolve that doubt in his favor and write a verdict of not guilty and acquit him.

> \* \* \* \* \* \*

> As I think I've indicated to you reasonable—what reasonable doubt means: I would tell you that the two phrases reasonable doubt and proof to a moral certainty are synonymous and the legal equivalent of each other. These phrases connote, however, a degree of proof distinguished from an absolute certainty. The reasonable doubt that the law gives the accused is not a weak or a slight doubt, but a serious or strong and well-

founded doubt as to the truth of the charge.

JA 779–80, 790–91.

In *Cage v. Louisiana,* —— U.S. ——, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), the Supreme Court found that similar jury instructions violated the defendant's due process rights. The instructions in *Cage* stated that a reasonable doubt

> *must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*

111 S.Ct. at 329 (citing *State v. Cage,* 554 So.2d 39, 41 (La.1989)) (emphasis supplied by Supreme Court). The Court stated that

> the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.

> When those statements are then considered with the reference to "moral certainty," rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

111 S.Ct. at 329–30.

■ As in *Cage,* the South Carolina trial court's instructions equated "reasonable doubt" with "moral certainty" and "substantial doubt." Although not using the words "grave uncertainty," the trial court's instruction that the doubt be "serious or strong and well-founded" conveyed the same meaning. Tested by *Cage,* the trial court's instruction diluted the reasonable doubt standard and allowed the jury to find Adams guilty by a measure of proof that failed to meet the requirements of the Due Process Clause.

■ Our conclusion that the jury instructions violated Adams's due process rights, however, does not require a new trial. Rather, we must decide whether we can retroactively apply the rule in *Cage* to *Adams.*

*Teague v. Lane,* 489 U.S. 288, 305–10, 109 S.Ct. 1060, 1072–75, 103 L.Ed.2d 334 (1989), holds that new rules do not apply retroactively to cases brought on collateral review. Adams's conviction was final in 1983 when the Supreme Court denied his petition for certiorari. The Supreme Court decided *Cage* in 1990. In order to determine whether *Cage* mandates that Adams receive a new trial, we must therefore decide whether it announces a new rule.

*Teague* stated that generally "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government" or "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 109 S.Ct. at 1070. The Supreme Court elaborated on this definition in *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), in which it explained that even if a court stated the result of a case was controlled by precedent, the case still announced a new rule if the outcome "was susceptible to debate among reasonable minds." 494 U.S. at 415, 110 S.Ct. at 1217. Another articulation of the test is whether a state court considering a claim at the time a conviction became final "would have felt compelled by existing precedent to conclude that the rule ... was required by the Constitution." *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990).

Adams argues that *Cage* did not articulate a new rule but simply applied the principle announced in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). He points out that *Winship* stressed the vital role of the reasonable doubt standard. *See* 397 U.S. at 363–64, 90 S.Ct. at 1072–73.

Nevertheless the conclusion that instructions such as those in *Cage* violate due process was subject to debate. Eight years after *Winship,* in *Taylor v. Kentucky,* 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56

L.Ed.2d 468 (1978), the Supreme Court remarked that courts have criticized jury instructions equating reasonable doubt with substantial doubt, though such a jury instruction is "perhaps not in itself reversible error." In *Miles v. United States,* 103 U.S. 304, 312, 26 L.Ed. 481 (1881), the Court observed: "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." Also, the Court has cautioned that misguided attempts to define the term "seem to create confusion...." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). Although we have criticized jury instructions that attempt to clarify the plain meaning of "reasonable doubt" by means of embellishing adjectives, we have not reversed convictions on this account. *See e.g., Smith v. Bordenkircher,* 718 F.2d 1273, 1276–78 (4th Cir.1983); *United States v. Moss,* 756 F.2d 329, 333 (4th Cir.1985). Consequently, we conclude that criticism of instructions that diluted the standard of reasonable doubt, without reversal for violation of the Due Process Clause, demonstrates that *Cage* announced a new rule.

A new rule nevertheless should apply in habeas corpus proceedings if it meets one of two exceptions. The first exception pertains to new rules that "place an entire category of primary conduct beyond the reach of the criminal law or new rules that prohibit imposition of a certain type of punishment for a class of defendants because of their status or offense." *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (citations omitted). *See also Teague,* 489 U.S. at 311, 109 S.Ct. at 1075; *Penry v. Lynaugh,* 492 U.S. 302, 329–30, 109 S.Ct. 2934, 2952–53, 106 L.Ed.2d 256 (1989). This exception is inapplicable to the facts in *Adams.* The rule announced in *Cage* does not place a type of conduct beyond the reach of criminal law or a type of offender beyond punishment.

The second exception applies to a new rule that "requires the observance of those procedures that ... are implicit in the concept of ordered liberty." *Teague,* 489 U.S. at 311, 109 S.Ct. at 1075 (citations omitted). *See also Butler,* 494 U.S. at 416, 110 S.Ct. at 1218. This exception is limited to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague,* 489 U.S. at 313, 109 S.Ct. at 1076. Stated differently, to fall under the second exception a rule must both improve the accuracy of trial and "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer,* 110 S.Ct. at 2831 (citation and interior quotation marks omitted).

It is quite evident that *Cage's* rule eliminates confusion and improves the accuracy of a trial. But it does not "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer,* 110 S.Ct. at 2831 (citation and interior quotation marks omitted). These elements remain the same. The burden of proof is not changed. *Cage* does not alter the elements; it criticizes their dilution. Our conclusion that *Cage* states a rule that should not be applied retroactively is consistent with *Skelton v. Whitley,* 950 F.2d 1037, 1044–45 (5th Cir.1992), *petition for cert. filed* (U.S. March 30, 1992) (No. 91–7784).

### III

Adams next argues that he was mentally incompetent during a portion of his trial and therefore his conviction violates due process. In a related claim he asserts that counsel was ineffective in failing to request a redetermination of his competency when his behavior indicated that he had deteriorated mentally. Adams argues that this failure deprived him of the opportunity to present mitigating evidence at the sentencing phase.

In December, 1979, and January, 1980, shortly after Adams was indicted, Dr. Herbert D. Smith conducted a psychiatric evaluation of Adams at the State Hospital. He concluded that although Adams suffered from mild mental retardation and some paranoid trends, he was not mentally ill and was competent to stand trial. Dr. Harold C. Morgan, who evaluated Adams at the request of defense counsel, later testified

that his findings were quite consistent with the State Hospital's findings shortly after indictment.

Before the second trial, Adams's counsel began to doubt his competence and asked Dr. Morgan to re-evaluate him. Dr. Morgan visited Adams and requested Dr. Diane Follingstad, a psychologist, to test him. Adams, however, would not cooperate. At the direction of the trial court, Dr. Smith conducted a 20–minute psychiatric interview immediately before jury selection and found Adams competent. Dr. Smith did not know about Adams's uncooperative behavior prior to the re-evaluation. Adams does not contend that he was incompetent before the second trial started, but he asserts that his subsequent bizarre behavior showed that he lost competency during the trial.

A defendant must be competent throughout the trial, not just at its commencement. *See Drope v. Missouri*, 420 U.S. 162, 181, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975). The test of competency is whether one "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

■ The magistrate conducted an evidentiary hearing on the issue of Adams's competency throughout the second trial. Both Adams and the state presented expert witnesses. Adams's trial counsel and the prosecutor also testified. Adams's contention, supported by his experts, is that he became incompetent during the trial, especially when he addressed the jury in a bizarre and partly irrelevant closing argument. The state's expert witness, Dr. Smith, expressed the opinion that Adams was competent and that he was no different during his argument to the jury than he was before trial. Conceding doubts about the accuracy of his diagnosis of paranoid personality, Dr. Smith said he believed Adams had mixed personalities. Nevertheless, he expressed the opinion that Adams remained competent throughout the trial.

In a lengthy opinion that devoted 21 pages to a review of the trial record and the conflicting evidence at the habeas corpus evidentiary hearing, the magistrate found that Adams was competent throughout his trial. Upon review of the magistrate's report and recommendation, the district court concluded that Dr. Smith's testimony provided a persuasive and wholly adequate basis for finding that Adams was competent throughout his trial.

The magistrate and the district court applied correct legal principles to the question of competency. Though the testimony was conflicting, ample evidence supports their findings and conclusions. Their resolution of this issue accords with that of the state habeas judge who also found that Adams was competent throughout his trial. The South Carolina Supreme Court, after an examination of the trial record, held that Adams's claim of incompetency lacked merit. *State v. Adams*, 279 S.C. at 237, 306 S.E.2d at 213 (1983). Adams has not rebutted the statutory presumption that the finding of competency made by the state habeas court and the Supreme Court is correct. 28 U.S.C. § 2254(d).

■ Adams's claim that his counsel were ineffective because they did not request a re-evaluation of his competency during the course of the trial must also fail. Inasmuch as Adams was competent, no prejudice resulted in either the guilt or the punishment phase of the trial because his counsel did not move for another competency examination. Lack of prejudice defeats Adams's claim of ineffective counsel. *See Strickland v. Washington*, 466 U.S. 668, 691–96, 104 S.Ct. 2052, 2066–69, 80 L.Ed.2d 674 (1984).

■ Adams also complains that his counsel were ineffective because they did not introduce at the sentencing phase mitigating evidence of his mild mental retardation and paranoid personality disorder. Adams did not raise this issue in the state proceedings or in his federal petition for a writ of habeas corpus. To correct this hiatus, Adams's present counsel links it to the allegation of ineffectiveness of trial coun-

sel because they did not seek re-evaluation of his competency during the trial. However, this linkage was not alleged in the state proceedings or in the federal petition. Neither the magistrate nor the district court addressed this linkage. Instead, their attention was devoted to the allegation that defense counsel were ineffective because they should have sought re-evaluation of Adams's competency during the trial, a claim that we have discussed and found to be without merit.

The claim that counsel were ineffective at sentencing is procedurally barred because Adams failed to raise it in the state proceedings. S.C.Code § 17–27–90; *Land v. State*, 274 S.C. 243, 246, 262 S.E.2d 735, 737 (1980). Adams has shown no cause for lifting this bar. The state procedural bar and Adams's failure to allege in his federal petition counsel's deficiencies at the sentencing phase preclude relief on this issue. *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991) (state procedural bar); *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (same); *Harrison v. Warden*, 890 F.2d 676, 679 (4th Cir.1989) (omission of allegation in federal petition).

■ Alternatively, we conclude that Adams's claim of ineffective counsel at sentencing lacks merit. Adams's appellate counsel argues that Adams's trial counsel's deficiency at sentencing arose out of their failure to request a mental evaluation during the second trial. But such an evaluation would have been inconclusive evidence of Adams's mental condition some three years before when he committed the crime. As a matter of fact, Dr. Smith had expressed the opinion shortly after the crime that Adams was mildly mentally retarded and exhibited paranoid personality trends. Dr. Morgan, Adams's expert, agreed with the findings Dr. Smith made at his initial examination shortly after the crime. Adams's counsel argued to the jury that his mental condition was a mitigating circumstance, and the judge instructed the jurors that they could consider his mental condition as a mitigating circumstance.

## IV

■ Adams contends that the prosecutor withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* states that suppression of evidence favorable to the accused after a request violates due process "where the evidence is material either to guilt or to punishment...." 373 U.S. at 87, 83 S.Ct. at 1197. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The undisclosed evidence must be considered in light of the entire record. *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

Adams claims he is entitled to a new trial because, despite his request for disclosure, the prosecutor did not inform him of Mark Culp's written statement.

■ Chambers, the victim, arrived at his home at 2:35 in the afternoon, and was killed sometime before 3:05. Mark Culp gave a written statement to the prosecution that he saw Adams outside Chambers's house and heading to his own home about five minutes after Chambers's arrival. Adams maintains this testimony could have been used to show that he could not have killed Chambers, because he could not have committed the murder and disposed of the body in five minutes.

The prosecutor interviewed Culp after Culp had given the written statement. Culp then said five minutes could mean a minimum of fifteen minutes. Culp later made a sworn statement that during the first trial he told one of defense counsel all he knew about Adams on the day Chambers disappeared. In the statement he said that he repeated this information in a conversation with defense counsel at the second trial. Later he claimed he never talked with defense counsel. In any event, nei-

ther the prosecutor nor defense counsel called Culp to testify at either the first or second trial. Adams's testimony at his trial was not consistent with Culp's statement. Adams claimed that he remained in his house after approximately 2:15, and he did not mention seeing Culp or the other person to whom Culp said Adams spoke. This inconsistency indicates that Culp's statement was neither exculpatory nor material.

Based on the weight of evidence against Adams, both the magistrate and the district court concluded that Culp's statement was not reasonably likely to have affected the outcome of the trial. The statement that Adams appeared five minutes after Chambers arrived home is of little significance compared to Adams's confession, his inconsistent alibi testimony, and Jeter's testimony.

■ Adams also complains that the prosecutor unlawfully withheld a police report about the questioning that resulted in Adams's confession. He argues that this report would have disclosed that the police elicited "his confession through a process of piecemeal questioning about each 'missing' detail." Specifically the report noted that Adams first claimed that Jeter killed Chambers, but when he was asked about a nylon cord, he denied tying Chambers with any cord. The police then asked about other details, and Adams finally admitted the crime.

Adams asserts that another police report would have shown that his alibi, first asserted when he was arrested, was not a recent fabrication. He contends that the prosecutor implied it was a recent fabrication by stating in final argument: "Now he raises some alibi." JA 727. The prosecutor never expressly charged that the alibi was a recent fabrication. This single cryptic remark was made in the course of a long summation.

*Brady, Agurs,* and *Bagley* dealt with the prosecutor's suppression of evidence that was known to the prosecutor but not to the defendant. Unlike the situation in those cases, the information in the police reports was known to Adams. Hence, strictly speaking, the prosecutor suppressed nothing.

The district court held that singly and cumulatively the items which the prosecutor did not disclose were not material in light of the evidence proving Adams's guilt. We concur in the district court's assessment of materiality.

V

Adams next claims that his confession should have been excluded because the police obtained it by violating his Fifth and Sixth Amendment rights, as enunciated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).

*Miranda,* 384 U.S. at 436, 86 S.Ct. at 1602, holds that information obtained from an individual subject to custodial police interrogation is inadmissible at trial unless the police followed certain procedural safeguards before eliciting it. These safeguards include advising the individual questioned of his Fifth Amendment right to remain silent and have counsel present. One may waive his *Miranda* rights as long as he does so "voluntarily, knowingly, and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85, holds that once an individual has requested counsel, police-initiated interrogation without counsel's presence violates the Fifth Amendment. Any confession obtained in that manner is therefore inadmissible at trial. *Jackson,* 475 U.S. at 636, 106 S.Ct. at 1411, holds that the same type of police conduct also violates the Sixth Amendment if the defendant's right to counsel has attached.

Adams was arrested on Friday, October 19, and stayed in jail through the weekend. According to Adams he asserted his right to remain silent, but police continued to interrogate him in violation of the Fifth Amendment. The prosecution concedes that the police asked Adams daily whether he wanted to make a statement, but that

each day he refused. The court appointed an attorney to represent Adams on Monday, October 22. On Tuesday, October 23, police drove Adams from the jail in Rock Hill to Columbia for a polygraph test. Adams claims this was done without informing counsel, in violation of the Sixth Amendment.

While returning to the jail from Columbia, Adams said he wanted to make a statement. The police refused to accept it at that time and told Adams that they would have to contact his attorney. Nevertheless, Adams made spontaneous implicating admissions.

Adams spoke with his attorney that night, who unsuccessfully tried to convince Adams not to confess. His attorney persuaded the police to agree that any oral statement Adams made would not be used against him unless he signed the statement after it had been reduced to writing. Adams then gave an oral confession. After it was reduced to writing, Adams and his attorney conferred, reviewing the draft line by line. Adams, disregarding his attorney's advice, signed the statement. He now contends that this statement resulted from his earlier Fifth and Sixth Amendment violations and therefore should not have been admitted into evidence at his trial.

The district court found that the signed confession was admissible, even if Adams could establish Fifth and Sixth Amendment violations by the taking of the polygraph test and any incriminating statements made in transit from Columbia. The court noted that no evidence existed that the signed confession resulted from the polygraph test, and it found Adams had made a "knowing, intelligent and counseled waiver of his Fifth Amendment rights." JA 1729. The district court also determined that the confession was voluntary. JA 1731.

 The fact that earlier incriminating statements may have been improperly obtained does not require suppression of a later, validly obtained confession. *Oregon v. Elstad,* 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985), states that "absent deliberately coercive or improper

tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." A suspect who has already made an inadmissible confession may subsequently waive the Fifth Amendment and make a statement that will be admissible at trial. "The relevant inquiry is whether, in fact, the second statement was also voluntarily made." 470 U.S. at 318, 105 S.Ct. 1285, 1298. The district court found no facts showing that the police used "deliberately coercive or improper tactics" in eliciting Adams's oral confession while traveling between Columbia and Rock Hill. His initial admissions, which were not introduced at trial, did not taint the subsequent written confession. Adams conferred with counsel and effectively waived the Fifth Amendment before making the second confession.

Adams effectively waived his rights as long as he did so "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. The test for whether he waived his rights intelligently is not whether "it was wise or smart to admit his participation in the crime, but whether his decision was made with *the full understanding that he need say nothing and that he might then consult with a lawyer if he so desired." Harris v. Riddle,* 551 F.2d 936, 939 (4th Cir.1977) (*quoting United States v. Hall,* 396 F.2d 841, 846 (4th Cir.1968)). Whether the decision was unwise or foolish is irrelevant. *Harris,* 551 F.2d at 939.

We conclude that Adams's waiver of his Fifth Amendment right against self-incrimination after conferring with his counsel was made voluntarily and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). *See also Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 490–91, 112 L.Ed.2d 489 (1990) (presence of counsel evidences effective waiver) (dictum). The conferences of Adams and his counsel before he gave his oral confession and signed his written confession

remedied any prior infringement of his Sixth Amendment rights.

## VI

■ Adams next asserts that he was deprived of his right to an impartial jury.

One of the prospective jurors stated on voir dire examination that he would believe a police officer's testimony before that of a private citizen. The trial judge then asked the juror if he could make a determination based on the evidence presented in court and the court's instructions on the law and if he could evaluate the testimony of the witnesses from what he saw in court. When the prospective juror responded that he could, the judge qualified him over Adams's objection. Neither Adams nor the prosecution struck the juror in question. Adams had two peremptory strikes remaining when the juror was seated, and ultimately he used only nine of his ten peremptory strikes. Adams now contends that seating the juror deprived him of his right to an impartial jury.

In federal habeas corpus cases, factual findings by the state court are presumed to be correct. 28 U.S.C. § 2254(d). This presumption applies to a trial court's determination that an individual juror is impartial. *Patton v. Yount,* 467 U.S. 1025, 1036–38, 104 S.Ct. 2885, 2891–93, 81 L.Ed.2d 847 (1984). The issue for the trial court is whether the juror swore "that he could set aside any opinion ... and decide the case on the evidence, and should the juror's protestation of impartiality [be] believed." 467 U.S. at 1036, 104 S.Ct. at 2891. A reviewing court must decide "whether there is fair support in the record for the state courts' conclusion that the juror[ ] ... would be impartial." 467 U.S. at 1038, 104 S.Ct. at 2892.

The record supports the trial court's conclusion that the juror would be impartial. He responded to the judge that he could determine Adams's guilt or innocence based on the evidence and instructions. We find no evidence in the record to overcome the presumption of correctness afforded state trial courts under § 2254(d). *See Wainwright v. Witt,* 469 U.S. 412, 426–30, 105 S.Ct. 844, 853–55, 83 L.Ed.2d 841 (1985).

Adams's reliance on *United States v. Evans,* 917 F.2d 800, 805–09 (4th Cir.1990), does not help him. On direct appeal in *Evans,* we ordered retrial because the district court failed to inquire on voir dire about prejudice in favor of police testimony. Part of the court's rationale was that had the question been asked and a juror's answer disclosed prejudice, "the trial judge would have been required to excuse this person for cause, or by instructions and additional questions convince the person that there is no special credence due the testimony of a policeman." 917 F.2d at 806. We did not require that every juror evidencing bias toward police testimony be excused. Rather, we instructed that when the government's case completely depended on police testimony, the trial judge should ask jurors about bias in order to determine and address any potential partiality.

In Adams's trial, the judge, after the juror's admission, questioned him further about bias and made a credibility determination based on the answer to his supplemental inquiry. Also, unlike *Evans,* police testimony in *Adams* did not form a predominant part of the government's case.

■ Moreover, Adams can demonstrate no prejudice since he did not avail himself of all peremptory strikes. Failure to exhaust peremptory strikes bars objection to the trial judge's refusal to excuse a juror for cause. *State v. Britt,* 237 S.C. 293, 306, 117 S.E.2d 379, 386 (1960). "[I]t can be concluded that the jury panel was seated with [the defendant's] approval." *State v. Smart,* 278 S.C. 515, 521, 299 S.E.2d 686, 690 (1982).

■ Adams protests, however, that if he had used his last strike to eliminate the objectionable juror, he would have had no opportunity to strike his replacement. This argument is foreclosed by *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Oklahoma, like South Carolina, requires a defendant to exhaust his peremptory challenges or forego his claim that an unqualified juror has been

seated. Explaining why this practice did not violate a defendant's constitutional rights, the Court said:

> Because peremptory challenges are a creature of statute and are not required by the Constitution, it is for the State to determine the number of peremptory challenges allowed and to define their purpose and the manner of their exercise. As such, the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides.
>
> It is a long settled principle of Oklahoma law that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror. Even then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him.
>
> \* \* \* \* \* \*
>
> Thus, although Oklahoma provides a capital defendant with nine peremptory challenges, this grant is qualified by the requirement that the defendant must use those challenges to cure erroneous refusals by the trial court to excuse jurors for cause. We think there is nothing arbitrary or irrational about such a requirement....

487 U.S. at 89–90, 108 S.Ct. at 2278–79 (citations omitted).

*Ross* establishes that South Carolina's practice is valid. If Adams had struck the objectionable juror with his last challenge, and the replacement had been a qualified juror, Adams would have no legally cognizable complaint. If the replacement had been unqualified, presumably the trial judge would have excluded him for cause. If, however, the judge had erred and allowed the unqualified replacement to sit despite Adams's objection, Adams could assign the error as a basis for a new trial.

We conclude that Adams has not proved that the trial judge erroneously qualified the juror. Also, because Adams did not use all of his peremptory strikes, the state

did not deprive him of any constitutionally protected right.

## VII

■ During closing argument, the prosecutor stated that Adams's lawyers were appointed and that they would not tell the jury the police officers beat Adams. Counsel for Adams did not object to the statement. Adams now argues that this statement denied him due process because it implied that defense counsel did not believe his testimony that the police beat him to force a confession.

Improper remarks during closing argument do not always mandate retrial. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citation and interior quotation marks omitted). We agree with the district court that the prosecutor's statements did not reach this level. As in *Darden,* 477 U.S. at 182, 106 S.Ct. at 2472, the weight of the evidence against Adams is heavy, and his attorney effectively addressed the prosecutor's statement in his closing argument. Also, the prosecutor's statement was an isolated remark, the court charged that arguments are not evidence, and counsel's failure to object demonstrates that they did not discern prejudice. *See United States v. Brockington,* 849 F.2d 872, 875 (4th Cir.1988).

Parenthetically, we note that in this appeal Adams has not assigned error to the admission of his confession on the ground that the police beat him.

## VIII

■ Adams next argues that the trial judge failed to communicate to the jurors that they could give mitigating weight to any aspect of the case that they thought deserved it.

The trial judge charged the jurors that they could recommend a life sentence for any reason at all, whether or not they found a statutory mitigating circumstance.

During jury deliberations, the jury asked the trial judge whether Adams's confession was a mitigating circumstance. The trial judge stated that it was "not a statutory mitigating circumstance, but as I have also instructed you, you may consider the case in its entirety...." JA 890. The judge was referring to a portion of the sentencing instructions in which he had said:

> [Y]ou may recommend a life sentence without finding the existence of an alleged statutory mitigating circumstance and you, as I have told you before, may recommend the imposition of the life sentence even should you find beyond a reasonable doubt the existence of an alleged statutory aggravating circumstance. In other words, you may in your good judgment, recommend a life sentence for any reason at all that you see fit to consider.

JA 878.

*Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), held:

> [T]he Eighth and the Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

438 U.S. at 604, 98 S.Ct. at 2964 (footnotes omitted). The trial judge did not violate the principle explained in *Lockett.* In his response to the jury the judge coupled his explanation that the confession was not a statutory factor with a reminder that the jury could consider the entire case. This response adequately conveyed to the jury it could consider any aspect of the case as a basis for a life sentence.

### IX

■ The jury could not impose the death penalty under South Carolina law unless it found that Adams killed Chambers while in the commission of kidnapping or housebreaking. S.C.Code § 16–3–20. Adams argues that since the jury did not find that the kidnapping and housebreaking occurred in the commission of murder, his death sentence violates the Eighth Amendment.

The trial judge charged the jury at the sentencing phase of the trial that it could consider as an aggravating circumstance that the murder was committed while in the commission of housebreaking and kidnapping. The judge also instructed the jury that if it "unanimously [found] beyond a reasonable doubt that one or more of those alleged statutory aggravating circumstances existed at the time the victim in this case was murdered," it would be authorized to recommend the death sentence. JA 876. The verdict at the sentencing phase of the trial was as follows:

> We, the jury in the above entitled case, having found beyond a reasonable doubt that the following statutory aggravating circumstances existed, house—kidnapping and housebreaking, now recommend to the Court that the Defendant, Sylvester Lewis Adams, be sentenced to death.

JA 893.

"A verdict is sufficient if the jury's intention can be ascertained with reasonable certainty from the language used in the verdict." *Carver v. Martin,* 664 F.2d 932, 935 (4th Cir.1981) (citation and interior quotation marks omitted). The jury's use of the word "existed" shows that it found that the aggravating circumstances were present at the time Adams killed Chambers. The verdict at the sentencing stage must be read with the verdict finding Adams guilty of murder at the conclusion of the guilt phase of the trial. The verdicts, the wording of the statute, the evidence, and the instructions of the court show that the jury sentenced Adams to death on the basis that he killed Chambers while in the commission of kidnapping and housebreaking. *Cf. Carver,* 664 F.2d at 935.

### X

■ Quoting S.C.Code § 16–3–910, the trial judge instructed the jury during the guilt phase of the trial as follows: "Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law ... shall be guilty

of the statutory offense of kidnapping." JA 784. In the sentencing instructions the judge did not narrow the definition of kidnapping, but simply stated that it was an aggravating circumstance. Adams argues that this definition is so broad that it could serve as an aggravating circumstance in virtually all murders, thereby violating the Eighth Amendment.

*Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), mandate that when a jury sentences a defendant "[i]t is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). We do not find that South Carolina's definition of kidnapping is unconstitutionally vague on its face. An example of a vague aggravating factor is found in *Godfrey,* 446 U.S. at 422, 100 S.Ct. at 1762, which provided that the murder be "outrageously or wantonly vile, horrible or inhuman." In contrast to the aggravating circumstance in *Godfrey,* the verbs in South Carolina's statutory definition of kidnapping give "meaningful guidance to the sentencer." *Walton,* 110 S.Ct. at 3058.

Also, South Carolina law authorizes the jury to impose the death penalty if one aggravating factor exists. S.C.Code § 16–3–20(C). The jury need not weigh the aggravating circumstances against the mitigating circumstances. The jury found two aggravating factors—kidnapping and housebreaking—the latter of which Adams does not challenge. Where one valid aggravating factor supports a death sentence and the jury need not weigh it against mitigating factors, the sentence need not be set aside simply because the jury also found an invalid aggravating factor. *Zant v. Stephens,* 462 U.S. 862, 884, 103 S.Ct. 2733, 2746, 77 L.Ed.2d 235 (1983).

## XI

At the sentencing phase of Adams's trial the prosecutor made the following argument to the jury:

There are four words that I consider important in somebody's life, rapport's one of them. You have to be able to communicate with people ... Coping is another one. You have to be able to cope to function in this world. If you can't cope, you can't function. Love's another one ... And the fourth one, repentance ... Now, again, I'll tell you, you recall the testimony and you recall if any of those four characteristics are held by that man right there. You do that. When you go back to that jury room and you deliberate, you try and decide whether he can handle any of those or whether he owns any of them, or whether he'll ever own any of them.

JA 857–58.

Adams now maintains that this language violated the Eighth Amendment because it suggested to the jury that his mental disabilities were aggravating, rather than mitigating, factors. He did not object to the remarks at trial or move for a mistrial.

Adams has not shown that the prosecutor's remarks were plain error. The district court noted that Adams's claim is based entirely on inferences he seeks to draw from the prosecutor's comments. The court concluded that the inferences drawn by Adams were unjustified because the prosecutor pressed on the jury no specific conclusion concerning Adams's mental state, nor did he explicitly urge the jury to treat Adams's mentality as an aggravating circumstance.

In *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974), the Court cautioned that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning...." This admonition is especially pertinent here since the trial judge had instructed the jury that it could consider Adams's mentality to be a mitigating factor. In agreement with the district court, we conclude that the prosecutor's comments did not infect the trial with unfairness that caused the sentence to be a violation of due process. *See Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2471.

The judgment of the district court is affirmed.

AFFIRMED.