21942

The STATE, Respondent, v. Sylvester Lewis ADAMS, Appellant.

(306 S. E. (2d) 208)

*David I. Bruck,* of *S. C. Com'n of Appellate Defense,* Columbia, *James W. Boyd,* York, and *Samuel B. Fewell, Jr.,* Rock Hill, *for appellant.*

*Atty. Gen. T. Travis Medlock, Retired Atty. Gen. Daniel R. McLeod* and *Asst. Atty. Gen. Harold M. Coombs, Jr.,* Columbia, and *Sol. William L. Ferguson,* York, for respondent.

June 29, 1983.

LITTLEJOHN, Justice:

This is an appeal from a criminal conviction on the charges of murder, kidnapping and housebreaking. The Appellant, Sylvester Lewis Adams (Adams), was sentenced to death. We affirm.

This case was tried previously. Upon appeal, a new trial was granted. *See, State v. Adams,* 277 S. C. 115, 283 S. E. (2d) 582 (1981).

On October 17, 1979, at approximately 3:00 p.m., Bryan Chambers, a sixteen year old with a slight learning disability, was taken from his home and strangled to death in a wooded area directly behind the house. Shortly thereafter, Bryan's mother received a phone call. The only words she could make out were "boy ... place ... money. ..." Bryan's mother hung up on the caller not knowing at that time that her son was missing.

The evidence introduced at the trial relating to the abduction is as follows:

> 1) Forced entry into the house through the rear door with the use of a tire tool (or jack handle).
> 2) A piece of tablecloth was torn from the dining room table and used to hold a sock in the victim's mouth.
> 3) Venetian blind cord, removed from the house, was used to bind his feet once he had been forced into the wooded area behind the house.
> 4) The strangulation was caused by placing a stick in

the tablecloth (pulled down around his neck) and tightening it in the fashion of a tourniquet.

5) A butcher knife was missing from the victim's home and there was a deep cut above one of his ears consistent with a blow from such a knife.

James Jeter was a key state's witness. His testimony may be abbreviated as follows: The defendant (Adams) rode a bicycle into Jeter's backyard where he was raking leaves. Adams had a tire tool, a gun and a pair of gloves in his possession. Adams told Jeter he was going to break into the house next door to steal money.

After entering the house, Adams attempted to solicit Jeter's aid in removing a safe he had allegedly found there. Jeter refused. Adams then stated he would await Bryan's return home from school to get the combination.

Jeter spoke with Bryan in Bryan's front yard when he returned home a few minutes later. He did not warn Bryan that Adams was inside because he was afraid.

A short time later, Jeter saw Adams lead Bryan into the woods with something white tied around Bryan's neck. He appeared to be resisting Adams.

A search for Bryan was conducted by Jeter's father and Bryan's father (A. C. Mitchell) in the early evening. Jeter became concerned about his friend and asked Adams where he was. Adams told him Bryan was tied up in an abandoned house and he would be released when Bryan's parents gave him (Adams) some money. He also told Jeter he had attempted a ransom call but Bryan's mother had hung up on him before he could tell her where to deliver the money.

Bryan's body was found covered with brush by rescue workers the following day. The next day (two days after the killing), Jeter told the police for the first time that he knew about the incident.

A. C. Mitchell testified that on the evening of his son's death, when he and a neighbor were searching for Bryan with the aid of Bryan's small dog (which had been found trapped inside the washing machine of the boy's home), Adams had frightened them away from the area where Bryan's body was later found by appearing with his pit bulldog allegedly to aid in the search.

Adams raised seven (7) issues for review by this Court. We hold that none assert reversible error.

## I.

Did the trial judge err in admitting for the jury's consideration exhibit identification tags which included written statements of police officers concerning issues of fact?

The following items were introduced into evidence by the prosecution and taken to the jury room during deliberations with identification tags prepared by the police attached:

(a) State's Exhibit No. 15, Jack handle or tire tool;
(b) State's Exhibit No. 4, Venetian blind cord container;
(c) State's Exhibit No. 16, Photograph of the backdoor of the victim's home; and
(d) State's Exhibit No. 2, Piece of torn table cloth.

When these exhibits were offered, counsel for Adams announced, "no objection" to Exhibit No. 16, and Exhibit No. 2. Objection to the introduction of Exhibit No. 15, jack handle, was solely on the ground that "one jack handle looks like another." Objection to Exhibit No. 4, venetian blind cord container, was solely on the ground that it had not been properly "linked up." Adams now argues that the information on the identification tags, when read together, presented to the jury a summary of the prosecution's theory of the case and impermissibly bolstered the credibility of the State's key witness. Normally, these objections would not be considered upon appeal, but inasmuch as this is a capital case, we accept all argument *in favorem vitae, State v. Adams, supra.*

The information on the identification tags was basically the same information to which the witnesses testified. Adams' own statement corroborates each tag. We hold that the tags were merely cumulative of testimony and other evidence introduced at trial and assert no error. *See generally, State v. Blackburn,* 271 S. C. 324, 247 S. E. (2d) 334 (1978), and *State v. Funderburke,* 251 S. C. 536, 164 S. E. (2d) 309 (1968).

## II.

Did the trial judge err in admitting Adams' confession into evidence as violative of his Fifth and Sixth Amendment constitutional rights?

At trial, the State offered, and the trial judge admitted, a written confession signed by Adams four days after his arrest. The confession was corroborative of, and certainly not inconsistent with, other evidence pointing conclusively to the guilt of the accused.

At an appropriate time, the judge held an *in camera* hearing and found beyond a reasonable doubt that Adams was given his *Miranda* rights, understood the rights, and that the statement was freely and voluntarily given and signed. Since there was conflicting evidence as to the validity of the confession, the trial judge, in the last analysis, submitted the issue to the jury. The same objection was interposed at the first trial of the case. Upon appeal, this Court declined to invalidate the confession, stating the following:

> We caution the court on remand to impress upon the jury that no confession may be considered by it unless found beyond reasonable doubt to have been given freely and voluntarily under the totality of the circumstances. *State v. Harris*, 212 S. C. 124, 46 S. E. (2d) 682 (1948), rev'd on other grounds, 338 U. S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815 (1949). In addition, since the appellant was in custody at the time of his alleged confession, the jury must be convinced that he received and understood his Fifth and Sixth Amendments rights, as mandated by *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. (2d) 694 (1966). See *State v. Pendergrass*, 270 S. C. 1, 239 S. E. (2d) 750 (1977); *State v. Doby*, 273 S. C. 704, 258 S. E. (2d) 896 (1979), cert. denied 444 U. S. 1048, 100 S. Ct. 739, 62 L. Ed. (2d) 735 (1980).

Upon the second trial now here for review, the judge followed these instructions, telling the jury:

> Mr. Foreman and ladies and gentlemen of the jury, I would instruct that before you may consider in evidence the statement or confession that was put into evidence, you must be convinced beyond a reasonable doubt that the defendant was advised of his right to remain silent, advised that anything he said could be used in evidence against him, that he had a right to counsel, that if he could not afford counsel that one would be provided him without charge. If the defendant was so advised, you may

only consider his admission if you find that he fully understood the warnings and nevertheless intelligently and knowingly elected to waive his rights.

\* \* \* \* \*

And so I'll instruct you, Mr. Foreman and ladies and gentlemen of the jury, that you must find that the defendant was advised of his rights, which I referred to, and knowingly understood them, and you must find that he was so advised and that the State has proved that he was given those rights, that he understood them. You must be convinced of that beyond a reasonable doubt. *And* you the jury must additionally, before you would consider that statement or confession, find beyond a reasonable doubt that the same was given freely and voluntarily under the totality of the circumstances.

When the evidence relative to violation of constitutional rights is conflicting, someone has to determine the issue of admissibility. This factual matter is first for determination by the trial judge; in the last analysis, it is for determination by the jury. While either the trial judge or the jury might have made this determination differently, the evidence does not warrant the conclusion as argued by counsel for Adams that the confession should have been excluded as a matter of law. It is clearly inferable that Adams persisted in signing the confession, ignoring the admonition of his counsel.

A recitation of the details leading up to the confession would serve no purpose. Suffice it to say the evidence was in conflict and the trial judge properly admitted the same in evidence. Having properly been admitted in evidence at the guilt or innocence stage, the confession was properly before the jury at the sentencing phase of the bifurcated trial.

### III.

Did the trial judge err in overruling Appellant's challenge for cause of a juror who stated that he would likely believe a police officer's testimony before that of a private citizen?

During the *voir dire* examination of a juror, the following exchange took place:

[By Defense Counsel:] Q. Would you believe a police officer's testimony before that of a private citizen?

A. Yes, sir.

Q. You think a police officer's testimony is more reliable?

A. I would think so.

Adams' attorneys made a motion that this juror be struck for cause. The motion was overruled.

"The relative competency of a prospective juror to be empaneled for a specific trial is a matter addressed to the sound discretion of the trial judge whose decision will not be disturbed unless wholly unsupported by the evidence." *State v. Gilbert*, 277 S. C. 53, 283 S. E. (2d) 179, 180 (1981), and cases cited therein.

In this instance, the trial judge made further inquiries of the prospective juror and received an affirmative response that he would make a determination of guilt or innocence "based upon the evidence and instruction of the law ...." Thus, there is support in the record for the trial judge's ruling and no abuse of discretion appears.

It is the further holding of this Court that the subject matter of this question is improper under *voir dire* examination as permitted by the *Code of Laws of South Carolina* (1976), as amended, § 16-3-20(D). It calls upon the juror to make a determination in his own mind as to whether one class of persons is more credible than another.

A juror should not, prior to trial, be required to assert which witnesses he will believe or what type of witness he will believe. This is true because a juror should believe those witnesses whose credibility appeal to him after he has heard all of the testimony. The question invades the province of the jury to determine individual credibility in the context of the entire case. *Cf. Cox v. State*, 248 Ga. 713, 285 S. E. (2d) 687 (1982).

## IV.

Did the trial judge err in allowing the case to proceed to trial after having Adams briefly examined by a psychiatrist who reported that he was competent?

In December and January of 1980, Adams underwent an extensive psychiatric evaluation at the South Carolina State

Hospital for the purpose of determining his competency to stand trial. He was found competent.

Adams was subsequently convicted and sentenced to death. Nearly two years passed before he was granted a new trial. Following reversal of his conviction by this Court, pre-trial motions came to be heard in the York County Court of General Sessions. The solicitor believed that a reevaluation of Adams' competency was mandated and so moved the court. Defense counsel opposed this motion on the grounds that Adams himself was opposed to it and it might interfere with pretrial preparation.

The trial court, out of an abundance of caution, granted the Solicitor's motion on the condition that the evaluation be performed locally.[1] Adams was examined in his cell for about twenty minutes by the same psychiatrist who had examined him nearly two years earlier. The psychiatrist stated that in his opinion, Adams was competent to stand trial.

■ South Carolina Code § 44-23-410 (1976), relating to when and how a defendant *must* be given a psychiatric evaluation is discretionary with the trial judge. *State v. Bradshaw*, 269 S. C. 642, 239 S. E. (2d) 652 (1977). *See also, State v. Drayton*, 270 S. C. 582, 243 S. E. (2d) 458 (1978).

■ The statute mandates such an examination, "Whenever a judge of the circuit court . . . has reason to believe that a person on trial before him, charged with the commission of a criminal offense, is not fit to stand trial because such person lacks the capacity to understand the proceedings against him or to assist in his own defense as a result of a lack of mental capacity . . . ." Thus, there was no requirement that Adams be reevaluated absent a finding by the trial judge of its necessity.

As was his right, Adams chose to participate in his own defense. On appeal, he now argues that certain statements he made during the trial indicate he was mentally incompetent

---

[1] The trial judge made these comments in ruling on the State's motion. "Well, this is a death penalty case and if there is an appeal of any sort, they will look at every small, minute thing and I don't think he can waive anything. All I want is for the rules to be followed, and I don't know if he can waive it. If he can waive it, fine. All I'm trying to do is [make] sure that everything is done."

to understand the proceedings against him or to assist in his own defense.

While it is true that Adams made several statements which could be considered damaging and which a more sophisticated person would not have made, it cannot be said that these statements rise to a level of suggesting mental incompetency and requiring reversal. The record is replete with instances where Adams exhibited a clear understanding of the proceedings and actively and competently aided his defense. We, therefore, hold that this exception is without merit.

## V.

Were the trial court's instructions during the sentencing phase of the trial adequate?

Next, Appellant Adams raises two questions concerning the adequacy of the trial judge's instructions to the jury during the sentencing phase of the trial. First, he alleges the trial judge erred in responding to a juror's question as to whether Adams' confession was a mitigating circumstance. Second, he alleges the trial judge erred in instructing the jurors that they were not required to individually state the basis for their sentencing decision.

In the initial charge, the trial judge instructed the jury that they were to consider any statutory aggravating and mitigating circumstances supported by the evidence and "any mitigating circumstances otherwise authorized or allowed by law...."

The trial judge further elaborated and stated:

> While it is necessary for you to find beyond a reasonable doubt the existence of at least one alleged statutory aggravating circumstance before you can recommend that the Defendant be sentenced to death, it is not required that you find beyond a reasonable doubt the existence of at least one alleged statutory mitigating circumstance in order to recommend that the Defendant be given life imprisonment. As a matter of fact, you may recommend that the Defendant receive a life sentence irrespective of whether you find the existence in the evidence of an alleged statutory mitigating circumstance or not. But where you consider an alleged statutory mitigating circumstance, it is proper for you to consider only

a statutory mitigating circumstance that is supported by the evidence. As I say, you may recommend a life sentence without finding the existence of an alleged statutory mitigating circumstance and you, as I have told you before, may recommend the imposition of the life sentence even should you find beyond a reasonable doubt the existence of an alleged statutory aggravating circumstance. In other words, you may in your good judgment, recommend a life sentence for any reason at all that you see fit to consider.

When the jury later returned to the courtroom to ask "does the confession constitute a mitigating circumstance to the crime," the trial judge advised, "it is not a statutory mitigating circumstance, but as I have also instructed you, you may consider the case in its entirety for your consideration." The foreman of the jury stated that the question had been answered.

It must be noted that the question put to the trial judge by the jury was not a question of law but a question of fact. It was, therefore, peculiarly within the province of the jury to make this determination. The trial judge's response to this question was both proper and adequate as a matter of law.

The jury also requested further instruction as to whether "they [would] each have to state individually why they have reached their own particular opinion, either life or death."

The trial judge first responded that each juror must find at least one of the aggravating circumstances in order to recommend the imposition of the death penalty, but that no stated finding was necessary to recommend to the court a life sentence. Apparently, there was further confusion on the part of the jurors as to whether it would be necessary for each juror to stand individually and verbally state their reasons for recommending either sentence.

The following colloquy took place:

JUROR: You still didn't clearly state if we had to stand down and say it, why —
THE COURT: You don't —
JUROR: — by ourself.
THE COURT: You don't have — you do not — it would be my understanding of the law that you can make your own

> individual determinations. You do not have to find a statutory mitigating circumstance and put it down on paper.
>
> JUROR: I mean — what we're talking about, if — do we have to stand up and say why do we feel that this defendant —
>
> THE COURT: No — you, you can deliberate and cast your own vote in the matter. It's not necessary that you — that the jury come to a conclusion or an individual juror state a finding. Does that answer the question?
>
> JUROR: So, we verbally don't have to stand up and say —
>
> THE COURT: Don't, don't proceed on that. If I've answered the question, do not proceed to comment.
>
> FOREMAN: Yes, Your Honor, you've answered the question.

Adams contends that this instruction may have inferred to the jurors that they could recommend the death penalty for any reason so long as they found a statutory aggravating circumstance. This argument is not substantiated by the record.

A supplemental jury instruction must be considered as a whole. *Sate v. Pulley*, 216 S. C. 552, 59 S. E. (2d) 155 (1950). Adams concedes that if the jury simply wished to know whether they must individually, verbally state the basis of their verdict, then the instruction was proper. Viewing the juror's question and supplemental instruction as a whole, we find that this is the only reasonable interpretation it can be given and thus there was no error. We so hold.

## VI.

Adams also alleged as error that the jury verdict form failed to indicate that the statutory aggravating circumstances were found "beyond a reasonable doubt." This argument is without merit. The judge's initial instructions stated that any aggravating circumstance must be found beyond a reasonable doubt and be the basis for the jury's recommendation of death if that sentence were recommended. We hold that this instruction was adequate and that there is no requirement that the verdict form indicate the standard of proof upon which the verdict is based.

Adams' remaining argument, raised for the first time at oral argument, that the prosecution's closing argument inpermissibly invaded the province of the jury is equally without merit.

Adams raised several other issues by exception which were neither argued nor briefed. Ordinarily, these exceptions would be deemed abandoned. However, in keeping with our principle of examining death penalty cases *in favorem vitae*, we have scrupulously examined these exceptions and find them to be without merit.

Pursuant to § 16-3-25(C), *Code of Laws of South Carolina* (Cum. Supp. 1978), it is the duty of this Court to review the record and determine with regard to the sentence imposed:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 16-3-20, and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Upon review of the record, we concur with the ruling of the trial court that ". . . prior to the imposition of the death sentence upon the Defendant, Sylvester Lewis Adams, I find as an affirmative fact that the evidence of the case warrants the imposition of the death penalty and that its imposition is not a result of prejudice, passion, or any other arbitrary factor."

Adams has presented no argument that the death sentence was imposed in violation of this requirement and we find none.

We further find that the evidence presented overwhelmingly supports the jury's finding beyond a reasonable doubt that the statutory aggravating circumstances of kidnapping and housebreaking were present as enumerated in *S. C. Code Ann.* § 16-3-20 (Cum. Supp. 1978).

Evidence presented by James Jeter, the victim's mother, and Adams' confession all support the findings that Bryan Chambers was kidnapped for the purpose of extorting money

from his parents. The evidence further supports a finding that the murder was committed while in commission of the crime of kidnapping. Incident to the kidnapping and murder, Adams committed the crime of housebreaking, which occurred in close proximity of both time and place to the commission of the murder.

We have further examined and researched past death penalty cases in this state tried under the current statute in an attempt to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *S. C. Code Ann.* § 16-3-25(C)(3), *supra.*

Cases tried in this state under the death penalty statute resulting in capital punishment heretofore, involved factual situations and accused persons similarly atrocious to those involved in this case. It is our observation that a unanimous jury in South Carolina has ordered the death penalty in only those cases where the proof of facts is virtually undebatable and the nature of the wrongful killing is such as to shake the conscience of the community. The facts are not the same in any two cases and, accordingly, our review of the facts relate largely to degree of culpability of the defendant and the viciousness of the killing. In the case at hand, there is no semblance of an excuse for the wrongful killing, nor does the record reveal any facts relative to the accused person himself that would warrant leniency. Our comparison includes: *State v. Yates,* _____ S. C. _____, _____ S. E. (2d) (_____), *State v. Gilbert,* 277 S. C. 53, 283 S. E. (2d) 179, Cert. den. 456 U. S. 984, 102 S. Ct. 2258, 72 L. Ed. (2d) 863, *State v. Shaw,* 273 S. C. 194, 255 S. E. (2d) 799, *cert. denied,* 444 U. S. 957, 100 S. Ct. 437, 62 L. Ed. (2d) 329, *Roach v. South Carolina,* 444 U. S. 1026, 100 S. Ct. 690, 62 L. Ed. (2d) 660, *State v. Woomer,* 276 S. C. 258, 277 S. E. (2d) 696 (1981), S. C., 299 S. E. (2d) 317 (1982), and *State v. Thompson,* 278 S. C. 1, 292 S. E. (2d) 581, *cert. denied,* 457 U. S. 1112, 102 S. Ct. 2917, 73 L. Ed. (2d) 1323.

The defendant in this case was a twenty-three year old man. His participation in the trial of the case, including his questioning of witnesses, indicates intelligence beyond question. He broke into the residence of his victim through force, lay in wait for his victim's arrival, took him from his home, strangled him to death, and hid his body under brush — all for the

purpose of attempting to extort money from the victim's parents. It would be difficult to conceive of a crime more heinous. We find that the penalty imposed is not disproportionate to the penalty imposed in other cases under the comparatively new death penalty statute. The jury had ample opportunity to weigh all of the evidence as might relate to mitigating circumstances and found none offsetting the aggravating circumstances. We agree.

All issues have been considered, even if not argued. In addition, we have searched the entire record to ascertain if there has been committed reversible error; we find none. The convictions and sentence of the Appellant, Sylvester Lewis Adams, are, accordingly,

Affirmed.

LEWIS, C. J., and NESS, GREGORY and HARWELL, JJ., concur.