23727

The STATE, Respondent v. Thomas Lee DAVIS, Appellant.

(422 S.E. (2d) 133)

Supreme Court

328

*John H. Blume* and *Frank W. Draper* both of *South Carolina Death Penalty Resource Center* and *South Carolina Office of Appellate Defense,* Columbia, *for appellant.*

*Attorney Gen. T. Travis Medlock* and *Chief Deputy Atty. Gen. Donald J. Zelenka,* Columbia; and *Sol. William Townes Jones, IV,* Greenwood, *for respondent.*

Heard May 18, 1992; Decided Oct. 5, 1992.

Reh. Den. Nov. 5, 1992.

HARWELL, Chief Justice:

This is an appeal of a capital trial wherein appellant Thomas Lee Davis (Davis) was found guilty of murder and sentenced to death. We affirm.

## FACTS

Around eight o'clock the evening before Thanksgiving 1988, Lisa Marie Schmidt was preparing to leave the campus of Lander College to spend the holidays with friends. She was accosted on the front steps of her dormitory, struck about the eyes and mouth, and forced along the front of the dormitory to

a point behind a growth of bushes about 40 feet away. Her forehead was battered against the rough surface of the dormitory, and she was strangled and raped. Her partially nude body was dragged approximately 175 feet to a goldfish pond and placed face down into the water. She was found there Thanksgiving morning.

Minutes before the crime was committed, another student confronted a stranger in the hallway of the dormitory where she and the victim resided. She spoke to the man for several minutes. The next day, after the victim was discovered, the student gave investigators a statement of the incident and helped prepare a composite drawing describing the intruder.

Davis, who is mildly retarded,[1] confessed to the crime in February 1989. Shortly after the confession, the student who had confronted the intruder was requested to view a photographic lineup. The student identified Davis from the lineup. Davis subsequently was indicted in March 1990 for kidnapping, criminal sexual conduct and murder.[2] At this time, the State entered notice that it would seek the death penalty.

Davis moved for a change in venue because of the extensive publicity surrounding his arrest and indictment. Rather than moving the location of the trial, however, the trial judge ordered that a jury be selected from another county and brought to Greenwood. In May 1990, jurors were picked in Florence County and transported to Greenwood County, where at a bifurcated trial, they found Davis guilty of murder, kidnapping, and criminal sexual conduct in the first degree. The jury subsequently sentenced Davis to death, finding the aggravating circumstances of kidnapping, criminal sexual conduct, and physical torture.

## DISCUSSION

## I. PRETRIAL ISSUES

A. *Selection of Jury*

Davis first contends that the trial judge possessed no authority to order the selection of jurors in Florence County because the statute granting this authority,

---

[1] Davis has an I.Q. of 66.

[2] Davis originally was indicted in August 1989 for kidnapping, criminal sexual assault, and murder.

S.C. Code Ann. § 17-21-85 (Supp. 1991), did not become effective until after the crime was committed. We disagree.

Section 17-21-85 provides:

> A circuit judge may, in a criminal case in which he determines that an unbiased jury cannot be selected in the county in which the defendant was indicted, order that jury selection go forward in some other county and the jury, when selected, be transported to the county in which the indictment was returned for the duration of the trial. In making a determination whether to proceed as allowed by this section or to order a change of venue for a trial, the court shall consider all the logistical and expense elements and, consistent with the demands of justice, choose the method that results in the least expense and greatest convenience for all parties involved in the case. All expenses of jury selection in another county must be paid by the county in which the trial occurs.

Davis argues that section 17-21-85 applies only to crimes committed after the effective date of the statute, which was January 31, 1990. According to Davis, the trial judge's decision to employ section 17-21-85 resulted in the retroactive application of the statute.

Generally, statutes are presumed to be prospective rather than retroactive, unless they are remedial or procedural in nature. *Jenkins v. Meares*, 302 S.C. 142, 394 S.E. (2d) 317 (1990). We find that section 17-21-85 is a procedural tool intended to give a trial judge an alternative to a change of venue in appropriate circumstances. When a statute is procedural, it ordinarily will be accorded a retroactive application in the sense that it will be applied to pending actions and proceedings. *Id.* We conclude that the trial judge did not err in utilizing section 17-21-85.

B. *Voir Dire Issues*

Davis next asserts that the trial judge improperly precluded him from examining prospective jurors regarding their bias in favor of testimony presented by police officers over lay persons. We disagree.

Davis's trial counsel asked a potential juror whether he would "give more weight to the testimony of a uniform officer than [he] would give to a lay person." The trial

judge disallowed further queries of this nature. Davis contends that the trial judge's ruling deprived him of the opportunity to select a fair and impartial jury.

We previously addressed this question in *State v. Adams*, 279 S.C. 228, 306 S.E. (2d) 208, *cert. denied*, 464 U.S. 1023, 104 S.Ct. 558, 78 L.Ed. (2d) 730 (1983), *overruled on other grounds, State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991). In *Adams*, we held that a juror should not, prior to trial, be required to identify which witnesses he will believe or what type of witnesses he will believe; rather, he must determine the credibility of witnesses after he has heard all of the testimony. Therefore, inquiry as to the weight a juror would give one kind of witness over another invades the province of the jury to determine individual credibility in the context of the entire case. *Id.* Based on our holding in *Adams*, we find that the trial judge did not err in preventing Davis from questioning jurors in an effort to ascertain whether they might give more weight to testimony presented by police officers than lay persons.

Davis next urges that the trial judge improperly disqualified a prospective juror who stated that she could not impose the death penalty upon a mentally retarded person. We disagree.

One of the potential jurors stated unequivocally during voir dire that she would never impose the death penalty on a mentally retarded defendant, no matter how egregious the crime and how slight the mental retardation. The trial judge disqualified the potential juror on the grounds that she would be unable to fulfill her duty to consider the statutory aggravating and mitigating circumstances which may be supported by the evidence as mandated by S.C. Code Ann. § 16-3-20(C) (Supp. 1991). According to Davis, he was denied an impartial jury because the trial judge disqualified a potential juror who would have given utmost consideration to the mitigating circumstance of mental retardation.

A juror must be unbiased, impartial, and able to carry out the law as it is explained to him. *State v. Green*, 301 S.C. 347, 392 S.E. (2d) 157, *cert. denied*, — U.S. —, 111 S.Ct. 229, 112 L.Ed. (2d) 183 (1990). A potential juror must be excused if his opinions would prevent or substantially impair the performance of his duties as a juror in accordance with his

oath and instructions. *Id.* Here, the record overwhelmingly supports the conclusion that the potential juror was so irrevocably committed to her position regarding mentally retarded persons that she would have refused to consider any statutory aggravating circumstances supported by the evidence.

The determination whether a juror is qualified to serve on a death penalty case is within the sound discretion of the trial judge and is not reversible on appeal unless wholly unsupported by the record. *Id.* We affirm the trial judge's disqualification of this potential juror.

### C. *Competency to Waive Rights and to Stand Trial*

Davis contends that his mental retardation precluded him from waiving his *Miranda*[3] rights.

Prior to Davis's first making a statement, Michael Butler of the Greenwood County Police Department read Davis the standard *Miranda* warnings from a card provided for that purpose. Butler read slowly, paused after each sentence, looked at Davis, and asked him to verbally indicate whether he understood what had been read to him. On each occasion, Davis responded, "Yeah." Butler asked Davis whether he desired to have a lawyer present. Davis stated, "I don't need a lawyer." Butler explained to Davis that he could end the interrogation at any time. Davis indicated that he understood this, and proceeded to give his confession. The confession was recorded on cassette tape.

The next morning Butler discovered that the dictaphone which was to have been utilized by a secretary to transcribe the tape was broken. Butler decided to have a secretary take down another statement in shorthand. After Davis agreed to give another statement, he was read his *Miranda* rights again by Eddie Clark of the South Carolina Law Enforcement Division (SLED). Both Butler and Clark testified that Davis was questioned as to as to whether he understood the *Miranda* warning. Davis made the same affirmative responses that he had made the previous night, and indicated that he did not desire to have an attorney present.

Davis was tested and observed at the Hall Institute in Columbia by Dr. Larry Montgomery, a forensic psychiatrist. Dr. Montgomery interviewed Davis in detail regarding his un-

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966).

derstanding of each of the rights accorded him by *Miranda:*

> The examination began on my asking Mr. Davis, or explaining to him that we were going to examine him to determine his competency and I asked him—first, I read his right, you have the right to remain silent. Then, I asked Mr. Davis to tell me what that meant. The response to me was I don't have to answer any questions. My next question was anything you say can and will be used against you in a court of law. What does that mean to you? His response was anything I say could go back to the judge. Next, I said you have a right to a lawyer before we conduct this examination. What does that mean? I said[.] He [said] I can have a lawyer present with me.

Davis presented other expert witnesses who testified that Davis did not have the mental ability to understand the implications of *Miranda.*[4] Dr. Montgomery conceded that Davis's understanding of his *Miranda* rights would be on a different, less abstract, level from a person of average intelligence, but that Davis's comprehension was adequate to enable Davis to knowingly and intelligently waive those rights. The trial judge held that Davis knowingly and voluntarily waived his rights under the fifth amendment to remain silent and to have counsel present with him at the interview.

A waiver of a constitutional right requires a showing on the record that the defendant made the waiver knowingly and intelligently. *State v. Arthur,* 296 S.C. 495, 374 S.E. (2d) 291 (1988), *modified, State v. Orr,* 304 S.C. 185, 403 S.E. (2d) 623 (1991), *overruled on other grounds, State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991). We conclude that there was sufficient evidence on the record, both lay and expert, to support the trial judge's determination that Davis was competent to waive his *Miranda* rights. Accordingly, we find that the trial judge did not err in finding that Davis was competent to waive his *Miranda* rights.

Davis also asserts that he lacked the mental capacity to understand the nature and effect of the proceedings around him, and thus should not have been subjected

---

[4] However, these expert witnesses based their assertions on general knowledge regarding persons with Davis's degree of mental retardation; they had not questioned Davis specifically regarding his understanding of *Miranda.*

to trial. The trial judge determined that Davis possessed the mental capacity to understand the nature of the charges against him and the ramifications associated with those charges; to assist counsel in his defense and to consult with them in regard to a strategy of defense; and to understand the roles of the participants in the judicial process.

Dr. Montgomery evaluated Davis's comprehension of the judicial process. According to Dr. Montgomery, Davis understood the charges against him and the possible penalties which might be imposed if he were convicted; was able to assist his counsel with his defense; and understood the role of the various courtroom officers. Dr. Montgomery also testified that Davis responded appropriately to inquiries, and, when questioned in the presence of his counsel, responded appropriately to counsel's instructions. Dr. Montgomery's conclusions were disputed by Davis's expert witness, Dr. Price. According to Dr. Price, Davis was unable to assist in his defense because he was an unreliable historian. Dr. Price acknowledged, however, that Davis understood who his lawyers were, and that he had been charged with killing someone and with having sex with someone he was not supposed to.

The test for competency to stand trial is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as factual, understanding of the proceedings against him. *State v. Bell,* 293 S.C. 391, 360 S.E. (2d) 706 (1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed. (2d) 682 (1988). We find that the trial judge's determination that Davis was competent to stand trial has evidentiary support. *See id.* Accordingly, we find that the trial judge did not err in finding that Davis was competent to stand trial.

## II. GUILT PHASE

A. *Introduction of Photographic Lineup*

Davis urges that the presentation of the photographic lineup was unduly suggestive and that the student's identification of him from the photographic lineup was unreliable. We disagree.

After Davis was taken into custody, a police officer prepared a photographic lineup utilizing Davis's mug shot as well

as a series of other photographs of persons with similar facial characteristics garnered from a mug book. Identifying information regarding the individuals appearing in the mug shots was masked. The student selected Davis's picture out of the photographic lineup as the person whom she had confronted the night of the murder.

Davis contends that the manner of presentation of the photographic lineup was unduly suggestive because the police officer, while handing the student the photographic lineup, asked her to see if she recognized anyone. Clearly, the student was aware that the reason she was requested to view the photographic lineup was because the police had a suspect. *See State v. Garcia*, 235 Neb. 53, 453 N.W. (2d) 469 (1990). There is no suggestion in the record that the police officer in any manner insinuated which photograph belonged to Davis. We find this argument to be without merit.

Davis also urges that the student's identification was tainted because the student had access to a composite drawing she had prepared with the help of SLED agents immediately after the murder. The student denied looking at the composite prior to viewing the photographic lineup. However, even if she had, we cannot say that the student's identification of Davis was suspect because she possessed a copy of a drawing based on her own memory of the stranger's face and clothing.

Davis also contends that the trial judge erred in allowing the introduction of the photographic lineup into evidence. For a photographic lineup containing mug shots to be admissible, the State must show a demonstrable need to introduce the photographs; the photographs must not imply that the defendant has a prior criminal record; and the manner of introduction at trial must be such that it does not draw particular attention to the source or implication of the photographs. *State v. Robinson*, 274 S.C. 198, 262 S.E. (2d) 729 (1980).

Aside from Davis's confession, the only direct evidence placing Davis at the scene of the murder was the student's testimony that she had confronted an unknown black male meeting Davis's description inside the dormitory. At trial, Davis challenged, on a variety of grounds, both the trustworthiness of the photographic lineup as well as the student's

identification of him. Thus, the introduction of the photographic lineup was crucial to the jury's determination of the integrity of the photographic lineup and the validity of the student's identification of Davis. We discern nothing in Davis's photograph from which the jury could have inferred that Davis had a prior criminal record, and, in fact, he had no prior record. Moreover, there was nothing to draw particular attention to the source or implication of the photographs. Under the analysis articulated in *Robinson*, we find that the photographic lineup was properly admitted into evidence.

B. *Mother's Testimony*

■ Davis contends that the trial judge erred in permitting the victim's mother to testify. We disagree.

■ The final witness in the State's case-in-chief in the first phase of the bifurcated trial was the victim's mother, who identified the jacket found near the goldfish pond as belonging to the victim. The State then elicited testimony from the mother regarding the victim's decision to attend Lander College. Davis contends that the probative value of the mother's testimony was outweighed by the impact of the testimony on the jury and its unfair prejudice to him. According to Davis, the mother's testimony conveyed to the jury that Davis was more deserving of the death penalty because the victim was a hardworking college student with strong aspirations to higher education.[5]

■ A trial judge is accorded broad discretion in ruling on the admissibility of the testimony. *See State v. Alexander*, 303 S.C. 377, 401 S.E. (2d) 146 (1991). Although some of the comments made by the victim's mother possessed little probative value, we do not perceive that they prejudiced Davis to such an extent as to affect the outcome of the trial. Much of the information elicited from the victim's mother regarding the victim already was known to the jury. Accordingly, we find that the trial judge did not abuse his discretion in permitting the victim's mother to testify during the guilt phase of the trial.

[5] Davis's trial counsel did not object to the mother's remarks. This being a pre-*Torrence* case, we must review the record as if trial counsel had objected and the trial judge had overruled his objection. *See State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991), *holding limited by State v. Davis*, — S.C. —, 411 S.E. (2d) 220 (1991).

## C. *Jury Charge Regarding* Miranda *Rights*

Davis next asserts that the trial judge failed to instruct ■ the jury that it must find beyond a reasonable doubt that Davis understood his *Miranda* rights before it could consider Davis's statements as evidence.

The trial judge charged the jury at the conclusion of the guilt phase that:

> While the court generally determines the admissibility of evidence, I instruct you that as regards any alleged statement made by this defendant that you members of the jury make the ultimate determination of whether, or not, the defendant made the said statement. And if he did make the statement, whether the statement was made by the defendant voluntarily and of his own free will and accord. And finally, just what weight, if any, should be given to any alleged statement. I charge you that you must determine if the alleged statement was a product of an essentially free and unconstrained choice by its maker. If you determine it was, and the burden is upon the state to prove this fact as all other facts beyond a reasonable doubt, then you may give the statement such further consideration as you deem proper. If you determine the alleged statement was not the free and voluntary willed expression of the defendant, then you should not consider the statement at all. In determining whether a defendant's will was overcome in obtaining a statement, you should consider both the characteristics of the accused and the details of the interrogation, which is referred to in the law as the totality of the circumstances. Some of the factors that you must consider are: The age of the accused; his education, or lack thereof; his mental ability, or capacity; his I.Q. or intelligence; his background and environment; the advice, or lack thereof, to the accused of his constitutional rights, including but not limited to the procedural safeguards known as the Miranda warnings, concerning the right to remain silent; that a statement could be used against him in a court of law; the right to have a lawyer present; if an indigent, that is he could not afford a lawyer, then a lawyer would be appointed to represent him without any cost; and that he could stop making a

statement at any time. Other factors to consider are the place and length of detention and the nature of the questioning. You, the jury, must carefully scrutinize all of the surrounding circumstances before you give any weight to an alleged statement. You must be satisfied beyond a reasonable doubt that the statement was made by the accused, uninfluenced by promise of reward, threat of injury, or diminution of his rights.[6]

Davis claims that the trial judge failed to comply with our holding in *State v. Adams*, 277 S.C. 115, 283 S.E. (2d) 582 (1981). In *Adams* we held that a trial judge must impress upon the jury that it cannot consider any confession unless it finds beyond a reasonable doubt that the accused gave his statement freely and voluntarily under the totality of the circumstances, *and* that the accused received and understood his *Miranda* rights.

The question whether law enforcement complied with the requirements of *Miranda* is for the court, not the jury. 23A *C.J.S. Criminal Law* § 1292 (1989). Once the court determines that a defendant received and understood his rights, the court allows a confession into evidence. It then is for the jury ultimately to decide whether the confession was voluntary. *Id.* However, our holding in *Adams* appears to submit to the jury not only the question of voluntariness, but also the separate issue as to whether law enforcement's actions conformed to the requirements of *Miranda*.

Requiring a jury to make a separate finding on the *Miranda* issue is against the weight of both federal and state authority. *See* 3 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 30.2(c) (2d ed. 1991). Properly stated, facts demonstrating that the defendant was given and understood his *Miranda* rights comprise but two elements a jury must examine under the totality of the circumstances when it seeks to determine whether a confession was made voluntarily. *See State v. Pendergrass*, 270 S.C. 1, 239 S.E. (2d) 750 (1977). Accordingly, we limit *Adams* to the extent that it mandates that the jury make a separate finding that the defendant received and understood his *Miranda* rights.

---

[6] The trial judge gave the jury a virtually identical charge at the conclusion of the sentencing phase of the trial.

We conclude that the trial judge's instruction properly explained to the jury that it should determine the voluntariness of Davis's confession under the totality of the circumstances, and that Davis's receipt of his *Miranda* warnings and ability to understand those warnings were appropriate factors to consider in deciding whether the confession was freely given. Davis's assertion is without merit.

D. *Deadly Weapons Charge*

Davis next contends that the trial judge erred in charging the jury that a hand or fist may be considered as a deadly weapon. We disagree.

Immediately after charging the jury that malice may be implied from the use of a dangerous or deadly object, the trial judge stated:

> What is a dangerous, or deadly, object? That is a factual matter that the jury must decide, or determine. You must answer that question factually based on this evidentiary record before you. Under the law of the State of South Carolina, the hand, or fist, of a person is not normally considered a dangerous, or deadly, object, but under some circumstances, a hand, or fist, of a person may be used in such a fashion, or in such a manner, as to constitute a dangerous, or deadly object. It is for you, the jury, to determine and decide in this case beyond a reasonable doubt whether, or not, a hand, or fist, constitutes a dangerous, or deadly, object.[7]

According to Davis, only instruments designed for the use of personal injury or objects which easily and readily are able to inflict personal injury have been recognized by the legislature to be deadly weapons by the legislature. *See* S.C. Code Ann. § 16-3-625 (1976) (shotgun, rifle, pistol, or knife); *id.* § 24-13-440 (1985) (dirk, slingshot, metal knuckles, razor, firearm, or any other deadly weapon usually used for infliction of personal injury). However, under the common law, ordinary objects also may become deadly weapons when the facts indicate that they have been used to inflict serious bodily harm or death. *See State v. Johnson,* 187 S.C. 439,

---

[7] A similar charge was given to the jury at the conclusion of the sentencing phase of the trial.

198 S.E. 1 (1938) (hoe); *State v. Smalls*, 17 S.C. 63 (1882) (barrel stave); *State v. Beadon*, 17 S.C. 55 (1882) (shovel). We expressly have not precluded the possibility that a hand or fist could constitute a deadly weapon. *See State v. Hariott*, 210 S.C. 290, 42 S.E. (2d) 385 (1947) ("While we are not prepared to say that the fist may not under some circumstances constitute an instrument which may inflict serious bodily injury, it is not generally regarded as a deadly weapon.")

Whether an object has been utilized as a deadly weapon depends upon the facts and circumstances of each case.

Here, the pathologist who conducted the autopsy of the victim testified that the blows to her head caused by her being battered against the dormitory wall were consistent with injuries that a person who had been struck with a heavy object, such as the back of an ax, would receive. He also testified that the pressure from the strangulation caused her thyroid gland and a portion of her larynx to hemorrhage. Clearly, had Davis used an inanimate object to strike and choke the victim, a jury charge regarding use of a deadly weapon would have been appropriate. We discern no reason to distinguish injuries caused by an instrumentality from similar injuries inflicted by a hand or fist. We agree with the trial judge that a hand or fist may be found by the jury to be a deadly weapon or object, depending upon the manner and means of its use, the wounds inflicted, and other relevant facts. *Accord State v. Grumbles*, 104 N.C. App. 766, 411 S.E. (2d) 407 (1991); *Quarles v. State*, 130 Ga. App. 756, 204 S.E. (2d) 467 (1974). We conclude that the trial judge did not err in charging the jury that a hand or fist could constitute a deadly weapon or object.

E. *Charge Regarding Resolving Doubt in Favor of Lesser Offense*

The trial judge charged the jury regarding both first degree criminal sexual conduct and the lesser included offense of second degree criminal sexual conduct.[8] Davis urges that the trial judge erred in failing to further in-

---

[8] Criminal sexual assault in the first degree requires a showing that the defendant used aggravated force to accomplish a sexual battery, or that the victim submits to sexual battery by circumstances where she is also the victim of a forcible confinement or kidnapping. S.C. Code Ann. § 16-3-652 (1976). Criminal sexual conduct in the second degree occurs when the perpetrator utilizes aggravated coercion. *Id.* § 16-3-653.

struct the jury that it should resolve any reasonable doubt as to whether the accused is guilty of the lesser or greater offense in favor of the lesser offense. We disagree.

In *State v. King,* 158 S.C. 251, 155 S.E. 409 (1930), we ■ held that a jury charge was incorrect in that it "did not clearly and correctly instruct the jury that, if they had a reasonable doubt as to whether the [defendant] was guilty of murder or manslaughter, it was their duty to resolve that doubt in his favor, and find him guilty of the lesser offense." We have held that a defendant who requests a *King* charge is entitled to an appropriate jury instruction. *State v. Robinson,* — S.C. —, 414 S.E. (2d) 142 (1992).[9]

However, in our opinion, there simply is no evidence to support a finding that the defendant was guilty of the lesser offense of second degree criminal sexual assault. Davis admitted that he struck the victim several times with his fist when she refused his advances, and that he continued to hit or shove her until they reached the location of the rape. The State's evidence indicates that the victim was severely physically abused before and during the sexual assault. The evidence also supports the jury's determination that the victim was kidnapped. Thus, Davis was not entitled to a charge regarding second degree criminal sexual conduct. *See State v. Atkins,* 293 S.C. 294, 360 S.E. (2d) 302 (1987), *cert. denied,* —U.S. —, 111 S.Ct. 2913, 115 L.Ed. (2d) 1076 (1991), *overruled on other grounds, State v. Torrence,* 305 S.C. 45, 406 S.E. (2d) 315 (1991) (the presence of evidence to sustain a conviction for a crime of a lesser degree determines whether it should be submitted to the jury). We find that, even had the trial judge been required to instruct the jury that it must resolve any reasonable doubt in favor of the lesser offense, the failure to so charge the jury would have been harmless error. We conclude that Davis's contention that the trial judge should have instructed the jury that it must resolve any reasonable doubt regarding whether Davis was guilty of first or second degree criminal sexual conduct in favor of the lesser offense is without merit.

---

[9] Davis's trial counsel did not request a *King* charge. As we noted earlier, this is a pre-*Torrence* case. Therefore, we review the record as if trial counsel had requested a *King* charge and the request had been denied by the trial judge.

## III. SENTENCING PHASE

### A. *Waiver of Right to Testify*

Davis next asserts that he was denied his constitutional right to testify at the sentencing phase of the trial. Davis's assertion that he was denied his right to testify at the sentencing phase of the trial encompasses two related issues: (1) whether Davis's waiver of his right to testify was satisfactorily shown on the record, and (2) whether trial counsel misinformed Davis that he could testify only regarding his background.

As to the sufficiency of the record, we have held that a full record must be developed to demonstrate that a defendant has waived his right to testify. *See State v. Orr*, 304 S.C. 185, 403 S.E. (2d) 623 (1991). This requirement may be satisfied by a colloquy on the record between the trial judge and trial counsel. *Id.* Here, trial counsel reported in depth their discussions with Davis regarding Davis's waiver of his right to testify. Trial counsel stated that they had informed Davis on several different occasions that he had the right "to talk to the jury, to say anything that he wanted to on his behalf." According to trial counsel, however, Davis consistently maintained, "I don't want to say anything; I want to do exactly as I told you before, I just want to sit there, I don't want to say nothing." Trial counsel concluded, based on their year-long relationship with Davis, that Davis understood his right to testify, and that it was Davis's decision, apart from any advice that trial counsel gave him, not to testify. Based on the information given to him by trial counsel, the trial judge determined that Davis had knowingly and voluntarily waived his right to testify during the sentencing phase of the trial. We find that the colloquy between trial counsel and the trial judge was sufficient to demonstrate that Davis was cognizant of his right to testify, and that he knowingly and intelligently waived that right.

As to Davis's claim that he was misinformed, Davis asserts that trial counsel incorrectly advised him that he was limited to testifying about his background. *See State v. Davis*, — S.C. —, 411 S.E. (2d) 220 (1991) (defendant may present argument regarding facts that are in evidence to direct the jury's attention to the circumstances of the crime or

the defendant's own characteristics since these are proper sentencing considerations). According to trial counsel, Davis understood that he had the right to "explain anything about himself that he would like to be made known." Trial counsel stated that they explained to Davis that he had the "opportunity to say anything to the jury regarding this segment of the trial." Trial counsel also told Davis that he could say "anything about his background, anything at all about Tommy Lee" that the jury could consider in mitigation.

As we construe the record for purposes of direct appeal, trial counsel advised Davis that he could discuss anything that the jury properly could consider during the sentencing phase of the trial, but that, from a strategic standpoint, Davis should confine his remarks to a discussion of his background. Thus, we conclude that Davis's waiver was intelligently made. We note that if other facts not appearing in the record before us would show that Davis did indeed receive erroneous information from trial counsel, our construction of the record may be collaterally attacked via an application for postconviction relief based on ineffective assistance of counsel.

B. *Solicitor's Comment on Davis's Failure to Testify*

Davis asserts that the solicitor commented during closing argument on Davis's failure to testify. We disagree. The fifth amendment privilege against self-incrimination extends to the penalty phase of a bifurcated capital proceeding. *State v. Hawkins*, 292 S.C. 418, 357 S.E. (2d) 10 (1987), *overruled on other grounds*, *State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991). A corollary of the right to remain silent is the prohibition of prosecutorial comment upon the failure to testify. *Id.* Here, in his summation, the solicitor urged the jury to find that the murder involved physical torture. He stated that the victim may have been conscious while she was being strangled, but that "we don't know that she was conscious at that point in time, but we don't know that she wasn't. *Only one person knows that.*"

Our review of the closing argument is based upon whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *State v. Caldwell*, 300 S.C. 494, 388 S.E. (2d) 816 (1990). When read in the context of the solicitor's ar-

gument as a whole, it is clear that his statement was not intended to remind the jury that Davis had not testified. A reasonable juror would have interpreted the solicitor's remark to mean that, because only the victim and the murderer were present the night of the murder, the jury was required to infer from circumstantial evidence whether the victim was physically tortured. Accordingly, we find that the solicitor's statement permissibly referred to circumstantial evidence which the jury was required to consider in arriving at its verdict. *See State v. Durden*, 264 S.C. 86, 212 S.E. (2d) 587 (1975).

### C. *Overbreadth of Kidnapping Aggravating Circumstance*

■ Davis next asserts that the statutory definition of "kidnapping" is overbroad. We disagree.

S.C. Code Ann. § 16-3-910 (1976)[10] provides in pertinent part that a kidnapping occurs when a person unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts or carries away any other person by any means whatsoever without authority of law. According to Davis, section 16-3-910 does not channel or limit the jury's discretion in imposing the death penalty, because nearly all murders involve some sort of seizure. Thus, according to Davis, section 16-3-910 fails to minimize the risk that the jury would act arbitrarily and capriciously in sentencing him. See *State v. Smith*, 275 S.C. 164, 268 S.E. (2d) 276 (1980).

We previously have rejected overbreadth attacks on section 16-3-910, and adhere to our determination that section 16-3-910 is not so broad as to encompass all cases of murder. *See State v. Copeland*, 278 S.C. 572, 300 S.E. (2d) 63 (1982), *cert. denied*, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed. (2d) 367 (1983); *State v. Koon*, 278 S.C. 528, 298 S.E. (2d) 769 (1982). We find that Davis's contention is without merit.

■ Davis next urges that even if section 16-3-910 is not overbroad, the evidence fails to support a determination that the murder was committed during the commission of a kidnapping. We disagree.

Davis's statement indicated that the victim "hollered" when Davis touched her, and that as a result he hit her several times. The clothing the victim was carrying was found scat-

---

[10] The crime was committed prior to the amendment of section 16-3-910 in 1991.

tered inside the front door of the dormitory, and one of her shoes was found lying in a corner, indicating that she was forcibly removed from the premises.[11] We find that the record supports the jury's finding that the murder was committed during the commission of a kidnapping. *Cf. State v. Owens,* 291 S.C. 116, 352 S.E. (2d) 474 (1987) (corpus delicti of kidnapping was established circumstantially by evidence of struggle in victim's home).

D. *Aggravating Circumstance of Physical Torture*

Davis next asserts that the trial judge improperly charged the jury regarding the statutory aggravating circumstance of "physical torture." We disagree.

The trial judge instructed the jury that:

> *Torture occurs when the victim is subjected to serious physical abuse before death. Torture occurs when the victim is subjected to aggravated battery. What is aggravated battery? An aggravated battery is an unlawful act of violent injury to the person of another, accompanied by circumstances of aggravation, such as the use of a dangerous, or deadly, object; the infliction of serious bodily injury with intent to commit a felony; a great disparity between the ages and physical condition of the parties; a difference in the sexes.* Physical torture is the intentional infliction of serious, vile, horrible, or inhuman abuse, upon the body of another before death. The instantaneous death of the victim does not constitute torture. Physical torture may include the malicious infliction of bodily harm to another by depriving her of a member of her body, or by rendering a member of her body useless, or by seriously disfiguring her body, or a member of her body, or the intentional and unmerciful prolonging of severe pain and abuse upon the body, or the intentional and unmerciful infliction of serious and extensive physical pain and abuse to the body of another. (Emphasis added.)

Davis contends that the proper jury charge regarding physical torture is limited to the instruction found in *State v. Elmore,* 279 S.C. 417, 423 n. 2, 308 S.E. (2d) 781, 785 n. 2 (1983).

---

[11] The victim's other shoe was found floating in the goldfish pond next to her body.

Davis urges that the trial judge impermissibly expanded the definition of physical torture when he added the initial four sentences of the charge which deal with "serious physical abuse" and "aggravated battery." However, in *Elmore* we held that physical torture occurs when a person is subject to "serious physical abuse" and "aggravated battery." *Id.* at 422, 308 S.E. (2d) at 785; *see also State v. Smith*, 298 S.C. 482, 381 S.E. (2d) 724 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed. (2d) 775 (1990) (physical torture occurs when the victim is intentionally subjected to serious physical abuse prior to death). Davis's assertion is without merit.

Davis next asserts that there was no evidence that he ■ possessed an intent to torture the victim separate from an intent to murder her. We disagree.

The evidence shows that the victim's forehead was battered against the rough surface of the dormitory wall with enough force to peel her skin and soft tissue away from her skull and to cause the orbital plate encasing her eyes to hemorrhage. Her nose was broken so that the bone protruded. Moreover, the victim had an extensive number of hemorrhaged blood vessels in her eyes. According to the pathologist, the hemorrhaged blood vessels indicated that there was "a lot of struggling" during the strangulation, and that the strangulation lasted in excess of ten minutes. Davis confessed that the victim's "stomach was still moving" when he commenced dragging her body to the goldfish pond. Davis also confessed that he placed the victim face down into the water.[12] Accordingly, we discern that there is evidence that Davis possessed an intent to torture the victim which was separate from an intent to murder her.

Davis also claims that the definition of physical torture ■ utilized by the trial judge rendered the statutory aggravating circumstance of physical torture overbroad. The construction and application of an aggravating circumstance is unconstitutionally broad if it does not channel or limit the jury's discretion in imposing the death penalty. *State v. Smith*, 298 S.C. 482, 381 S.E. (2d) 724 (1989), *cert. denied*,

---

[12] The pathologist could not state with medical certainty that the victim was still alive when she was placed face down into the water; however, he attributed her death to her head injuries and the strangulation, rather than to drowning.

494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed. (2d) 775 (1990). In our opinion, the definition of "physical torture" utilized by the trial judge complies with the limiting requirements of the eighth amendment. Davis's assertion is without merit.

E. *Submission of Three Aggravating Circumstances*

Davis finally asserts that the trial judge's submission of kidnapping, criminal sexual conduct, and physical torture as aggravating circumstances in this case rendered his death sentence arbitrary and unreliable. We disagree.

The trial judge must submit to the jury those aggravating circumstances which the State has noticed the defendant, if the aggravating circumstances are supported by the evidence. *State v. Kornahrens*, 290 S.C. 281, 350 S.E. (2d) 180 (1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1592, 94 L.Ed. (2d) 781 (1987). Here, the evidence supports the submission of each of the three aggravating circumstances of criminal sexual conduct, physical torture, and kidnapping. We conclude that Davis's assertion is without merit. *Cf. State v. Woomer*, 277 S.C. 170, 284 S.E. (2d) 357 (1981).

## PROPORTIONALITY REVIEW

We have reviewed the entire record *in favorem vitae* and conclude that the death sentence was not the result of passion, prejudice, or other arbitrary factor, and the evidence supports the jury finding of aggravating circumstances. S.C. Code Ann. § 16-3-25(C)(1)-(2) (1985). The death sentence is not excessive or disproportionate to the penalty imposed in similar cases. *Id.* at (C)(3). *See State v. Sims*, 304 S.C. 409, 405 S.E. (2d) 377 (1991), *cert. denied*, — U.S. —, 112 S.Ct. 1193, 117 L.Ed. (2d) 434 (1992); *State v. Bell*, 302 S.C. 18, 393 S.E. (2d) 364, *cert. denied*, — U.S., 111 S.Ct. 227, 112 L.Ed. (2d) 182 (1990); *State v. Bell*, 293 S.C. 391, 360 S.E. (2d) 706 (1987), *cert. denied*, 484 U.S. 1020, 108 S.Ct. 734, 98 L.Ed. (2d) 682 (1988).

The convictions and sentences are

Affirmed.

CHANDLER and TOAL, JJ., and JOHN P. GARDNER, Acting Associate Justice, concur.

FINNEY, J., dissents in separate opinion.

FINNEY, Justice (dissenting):

I respectfully dissent. In my opinion, the record reflects prejudicial error during both the guilt and penalty phases of appellant's bifurcated trial. I would reverse and remand for a new trial.

## GUILT PHASE

*Mother's Testimony*

The majority's finding that the trial judge did not abuse his discretion in permitting the victim's mother to testify during the guilt phase of the trial is refuted by the record. Ostensibly, the mother was called to identify a jacket found near the crime scene. After the identification was completed, the solicitor continued the questioning, asking the mother how tall was her daughter, why did she choose to send her daughter to Lander, and was she close with her daughter.

Evidence is relevant if it has a direct bearing upon and tends to establish or make more or less probable the matter in controversy. In *State v. Alexander*, 303 S.C. 377, 401 S.E. (2d) 146 (1991), this Court adopted the rule that although relevant, evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value.

There is no showing in the record that the mother's identification of the jacket constituted evidence even remotely essential to the case. Hence, any probative value of her identification evidence was substantially outweighed by the tendency of additional testimony from the victim's mother to unduly influence the jury to decide their verdict upon the basis of sympathy. I would hold that the mother's testimony should have been excluded due to its most probable highly prejudicial effect.

*Jury Charge Regarding Miranda Rights*

I suggest that by upholding the trial judge's failure to charge the jury conclusively and unambiguously that they must find beyond a reasonable doubt that the accused understood his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. (2d) 694 (1966), the majority now seeks to arbitrarily limit the established law of this state by interject-

ing that an accused's rights under *Miranda* are merely "appropriate factors to consider" in deciding whether or not confessions are given freely and voluntarily.

South Carolina law is clear on the prerequisites to be established before a jury may consider the confession of an accused. First, the jury must find beyond a reasonable doubt that the confession was given freely and voluntarily under the totality of the circumstances. Second, when the accused is in custody at the time such confession is made, the jury must be convinced that he received and understood his Fifth and Sixth Amendment rights under *Miranda*. *See State v. Torrence*, 305 S.C. 45, 406 S.E. (2d) 315 (1991); *State v. Cooper*, 291 S.C. 332, 353 S.E. (2d) 441 (1986); and *State v. Adams*, 277 S.C. 115, 283 S.E. (2d) 582 (1981).

I would hold that this limiting charge with regard to *Miranda* is in derogation of the United States Constitution and South Carolina case law and was prejudicial to the rights of the appellant.

*Deadly Weapons Charge*

I dissent from the majority's affirmance of the trial judge's charge that a hand or fist could be used in such a fashion or manner as to constitute a deadly weapon or object.

The majority relies upon *State v. Hariott*, 210 S.C. 290, 42 S.E. (2d) 385 (1947), which not only states that fists generally are not considered deadly weapons, but has been cited in support of the proposition that parts of the human body are not to be regarded as dangerous weapons. *See Commw. v. Davis*, 10 Mass. App. 190, 406 N.E. (2d) 417, 420 (1980), and *People v. Van Diver*, 80 Mich. App. 352, 263 N.W. (2d) 370, 372 (1977).

Moreover, thorough research uncovers no South Carolina case law construction or statutory provision evincing legislative intent to classify human bodily extremities as deadly weapons under the facts herein presented. As noted by the trial judge, ". . . we deal with unchartered waters and confront a case and issue of novel impression in South Carolina." For guidance, the trial court looked to the neighboring jurisdiction of Georgia. *See Thomas v. State*, 237 Ga. 690, 229 S.E. (2d) 458 (1976); *Kirby v. State*, 145 Ga. App. 813, 245 S.E. (2d) 43 (1978); and *Quarles v. State*, 130 Ga. App. 756, 204 S.E. (2d) 467 (1974). However, in order to dispose of the issue under

consideration, we need not address the merits of adopting or rejecting this theory since the trial court was bound by the state of the law as it existed at the time of trial. The trial judge is required to charge the "current and correct law" of the state. *State v. Robinson*, — S.C. —, 412 S.E. (2d) 411 (1991); S.C. Const. art. V § 21; *State v. Adams, supra*, 283 S.E. (2d) at 585.

The trial court's error was compounded by the following prejudicial comments made by the solicitor during summation.

> Now, I mention his hands as deadly weapons because if you, the jury, find that he used his hands as deadly weapons that night, both for the hitting, the beating about the face, and if we recall, Dr. Sexton also testified that she had a broken nose and injuries around her nose, cut marks that he said in his opinion were caused not by a rough surface, but what he did say, by a smooth surface, either the hands, the fists, or gloved hands, or fists, causing the injuries. But if you conclude the defendant used his hands as deadly weapons, then you could conclude that there is implied malice in this instance, that these hands were used as deadly weapons, giving rise to malice, giving rise to murder.

I would find as an additional ground for reversal the cumulative prejudicial effect, when considered together, of the solicitor's jury argument and the trial judge's erroneous charge which would, in my view, entitle the appellant to a new guilt-phase trial.

## SENTENCING PHASE

*Waiver of Right to Testify*

Finally, I reject the conclusion of the majority opinion that the appellant's waiver of his right to testify during the sentencing phase of his trial was intelligently waived.

Conversely, I believe the record shows that the appellant was denied the right to testify at the sentencing phase of trial due to trial counsel's failure to adequately and correctly advise the appellant of the nature of testimony which was permissible. In response to the trial judge's question concerning appellant's Fifth Amendment right to testify during the sentencing phase, his trial counsel responded:

> . . . I asked him, explained to him what this procedure was the best I could so that he could understand it . . . I told him this was not the part of the trial to talk about, or have no discussions about guilt or innocence, because that was over. And *I told him that where we were at in this portion of the trial was in the area of mitigation and anything he could say about Tommy Lee in terms—that would touch upon this jury in line of mitigation, explained that to him, anything about his background, anything at all about Tommy Lee that this jury may consider in mitigation. I made it very clear that, Tommy, I don't want you to get up there, or you can't get up there and talk about the guilt, or innocence, we can't touch upon that because that's already behind us. And he understood.* And I said, now, considering what the rules of the game are do you want to get up there and talk to the jury and testify . . .

An accused may be prohibited from offering unsworn testimony in his statement to the sentencing-phase jury. However, a defendant may present argument regarding facts in evidence to direct the jury's attention to the circumstances of the crime or to his personal characteristics since these are proper sentencing considerations. *State v. Davis,* — S.C. —, 411 S.E. (2d) 220 (1991).

The knowing and voluntary waiver requirement must be satisfied by a full record, and may be established by colloquy between the court and the accused himself, between the court and counsel for the accused, or both. *State v. Orr,* 304 S.C. 185, 403 S.E. (2d) 623 (1991).

Trial counsel's foregoing statement to the court is, at best, ambiguous and seriously deficient with regard to accuracy. Furthermore, the record is devoid of any indication that either of appellant's trial counsel informed him that he could discuss the facts of the case as they relate to his plea before the jury seeking mitigation of his sentence. Obviously, the mandate for a full and adequate record becomes singularly crucial in light of the evidence concerning appellant's mental capacity. See *State v. Orr, supra,* and *State v. Arthur,* 296 S.C. 495, 374 S.E. (2d) 291 (1988).

I would hold that the record in this case fails to establish a knowing and intelligent waiver by the appellant of his right to testify during the sentencing phase of his trial and that he is, therefore, entitled to a new sentencing-phase trial.

For the foregoing reasons, I would reverse this case and remand for new trial.